No. 25-2754

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

**Scarlett Pavlovich**,

Plaintiff - Appellee

**v.**

**Neil Gaiman**,

Defendant - Appellant

**On Appeal from**
United States District Court for the Western District of Wisconsin

3:25-cv-78-jdp

**BRIEF OF APPELLANT SCARLETT PAVLOVICH**

SUBMITTED BY:

Lane A. Haygood
**Kamerman, Uncyk, Soniker & Klein, P.C.**
1700 Broadway
New York, NY 10019
(212) 400-4930
lhaygood@kusklaw.com

**ORAL ARGUMENT REQUESTED**

# RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel of record certifies that, pursuant to 7th CIR Rule 26.1(b), the following is the name of all law firms whose partners or associates have appeared for the party indicated.

| **Appellees:** | **Counsel for Appellees:** |
|---|---|
| Neil Gaiman | Andrew B. Brettler of Berk Brettler, Hollywood, CA |
| | Stephen E. Kravit and Briant T. Fahl of Kravit, Hovel and Krawczyk, Milwaukee, WI |
| **Appellants:** | **Counsel for Appellants:** |
| Scarlett Pavlovich | Lane Haygood, Akiva Cohen, Dylan Schmeyer, and Thomas Neville of Kamerman, Uncyk, Soniker & Klein, P.C., New York, NY |
| | Matthew Jelenchick of Niebler Pyzyk, Milwaukee, WI |
| | Michael Nimmo of Wahlberg, Woodruff, Nimmo, and Sloane, LLP, Denver, CO |

/s/Lane Andrew Haygood
Attorney of record for Scarlett Pavlovich

# STATEMENT REGARDING ORAL ARGUMENT

Oral argument is appropriate in this case given the complexities of the legal issues under consideration and their effect on persons living abroad.

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT ........................................................ ii

STATEMENT REGARDING ORAL ARGUMENT .......................................... iii

TABLE OF CONTENTS ................................................................................iv

TABLE OF AUTHORITIES ........................................................................... 1

JURISDICTIONAL STATEMENT ................................................................. 4

STATEMENT OF THE ISSUES......................................................................5

STATEMENT OF THE CASE ........................................................................ 6

SUMMARY OF THE ARGUMENT ................................................................ 9

ARGUMENT

I.    *Forum non conveniens* dismissal is reviewed for abuse of discretion, but the district court's legal conclusions are reviewed *de novo*............................10

II.   Congress's 2008 amendment to the TVPA deliberately opened United States courts to civil claims arising out of U.S. citizens' and residents' extraterritorial conduct. ........................................................................ 11

   A.  The TVPA clearly and unambiguously provides a civil remedy for extraterritorial conduct ..................................................................14

   B.  RJR Nabisco's holding that RICO does not provide an extraterritorial civil remedy does not change the analysis......................................... 20

III.  The court below erred when it dismissed Plaintiff's claim based on *forum non conveniens*........................................................................................ 22

   A.  The common law doctrine of *forum non conveniens* has no application to TVPA claims. ..............................................................................23

B.   The district court erred in balancing the public and private interest factors. ................................................................27

1.   The court below misapplied the public interest factors ...............28

2.   The court below misapplied the private interest factors. .............30

3.   The court below improperly balanced the public and private interest factors and the interests of justice ................................ 35

C.   New Zealand is not an adequate alternative forum because it provides no meaningful remedy for Scarlett's injuries. .....................................36

CONCLUSION ................................................................. 40

CERTIFICATE OF SERVICE ........................................... 41

CERTIFICATE OF COMPLIANCE ................................... 42

APPENDIX

Order Below............................................................Tab 1

# TABLE OF AUTHORITIES

## Cases

*Abernathy v. Carlyle Grp., Inc.*, No. CV 22-3603 (ABJ), 2024 WL 5331993 (D.D.C. Sept. 27, 2024) ........................................................................................................ 12, 19

*Adhikari v. Daoud & Partners* (*Adikhari I*), 994 F. Supp. 2d 831 (S.D. Tex. 2014) ........................18

*Adhikari v. KBR Inc.* (*Adikhari II*), No. 4:16-CV-2478, 2017 WL 4237923 (S.D. Tex. Sept. 25, 2017) .................................................................................................18

*American Dredging Co. v. Miller*, 510 U.S. 443 (1994) ....................................................27

*Deb v. SIRVA, Inc.*, 832 F.3d 800 (7th Cir. 2016) ..............................................9, 10, 26

*Domanus v. Lewicki*, 645 F. Supp. 2d 697 (N.D. Ill. 2009) ..............................................38

*Duha v. Agrium, Inc.*, 448 F.3d 867 (6th Cir. 2006) ...................................................... 30

*F.C. v. Jacobs Solutions Inc.*, 790 F.Supp.3d 1158 (D.Colo. Jun. 26, 2025) .............................. 12, 16

*Flack v. Nutribullet, L.L.C.*, No. 218CV05829DDPSSX, 2018 WL 6330421 (C.D. Cal. Dec. 4, 2018) ....................................................................................36

*Fruitstone v. Spartan Race Inc.*, 464 F. Supp. 3d 1268 (S.D. Fla. 2020) ........................................33

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) ..............................................22, 23, 26, 27

*Huff v. White Motor Corp.*, 609 F.2d 286 (7th Cir. 1979) ..............................................38

*In re Am. Med. Sys., Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, No. 2:13-CV-19418, 2014 WL 637189 (S.D.W. Va. Feb. 18, 2014) ........................................................37

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 887 F. Supp. 1469 (N.D. Ala. 1995) .............37

*Indus. Inv. Dev. Corp. v. Mitsui & Co.*, 671 F.2d 876 (5th Cir. 1982) ................................................25

*Instituto Mexicano del Seguro Social v. Zimmer Biomet Holdings, Inc.*, 29 F.4th 351 (7th Cir. 2022)10

*Kamel v. Hill-Rom Co., Inc*, 108 F.3D 799 (7th Cir. 1997) ........................................ 29

*La Seguridad v. Transytur Line*, 707 F.2d 1304 (11th Cir. 1983)...................................... 24

*Lueck v. Sundstrand Corp.*, 236 F.3d 1137 (9th Cir. 2001) ..............................................36

1

*Lynn v. Becton Dickinson & Co.*, No. 2:21-CV-5004, 2022 WL 610819 (S.D. Ohio Mar. 2, 2022) 33

*Martinez v. Bloomberg LP*, 740 F.3d 211 (2d Cir. 2014) ................................................10

*Mia v. Kimberly-Clark Corp.*, No. 22-cv-2353, 2025 WL 752564 (D.D.C. Mar. 10, 2025) ............12

*Miles v. Illinois Cent. R. Co.*, 315 U.S. 698 (1942) ........................................................23

*Pavlovich v. Gaiman*, No. 25-CV-78-JDP, 2025 WL 2819372 (W.D. Wis. Oct. 3, 2025) ....... passim

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) .................................................. 35, 36, 38

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289 (S.D.N.Y. 2003) ..... 29

*Ratha v. Rubicon Res., LLC*, 111 F.4th 946 (9th Cir. 2024) ...........................................18

*RJR Nabisco v. European Community*, 579 U.S. 325 (2016) ................................................... passim

*Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019) ........................................................... passim

*Salebuild, Inc. v. Flexisales, Inc.*, 633 F. App'x 641 (9th Cir. 2015) ................................................33

*Shi v. New Mighty U.S. Tr.*, 918 F.3d 944 (D.C. Cir. 2019) ......................................... 30

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007) .....................................27

*Stonnell v. Int'l Harvester Co.*, 132 Ill. App. 3d 1043 478 N.E.2d 518 (1985) ...................................37

*U.S. ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162 (D. Md. 2019) ...........................18

*U.S. ex rel. Hawkins v. ManTech Int'l Corp.*, No. CV 15-2105 (ABJ), 2024 WL 4332117 (D.D.C. Sept. 27, 2024) ................................................................................................19

*U.S. v. Nat'l City Lines*, 334 U.S. 573 (1948) ........................................................22, 23

*United States v. Baston*, 818 F.3d 651 (11th Cir. 2016) ....................................................17

*United States v. Chaparro*, 956 F.3d 462 (7th Cir. 2020) ...............................................10

*Zipfel v. Halliburton Co.*, 832 F.2d 1477 (9th Cir. 1987) ........................................ 24

## Statutes

18 U.S.C. § 1595(a) ........................................................................................ passim

18 U.S.C. § 1596 .................................................................................... 15, 21

18 U.S.C. § 1964 .................................................................................................... 20

22 U.S.C. § 7101 ............................................................................................... 10, 16

TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT OF 2003,
PL 108–193, December 19, 2003, 117 Stat 2875 ........................................... 11

WILLIAM WILBERFORCE TRAFFICKING VICTIMS PROTECTION
REAUTHORIZATION ACT OF 2008, PL 110–457, December 23, 2008, 122 Stat 5044.11, 15

## Other Authorities

Doyle, CONG. RESEARCH SERV., R40190, THE WILLIAM WILBERFORCE
TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT OF 2008
(P.L.110-457): CRIMINAL LAW PROVISIONS (2009) .......................................... 11

Pub. L. 106–386, § 102(a)-(b), Oct. 28, 2000, 114 Stat. 1489 (2000) ................................ 28, 29, 35

Pub. L. 108–193, §2, Dec. 19, 2003, 117 Stat. 2878 (2003) .......................................... 28

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 to hear this case because claims were brought under the civil remedies provisions of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. Chapter 77 (the "TVPA"). The district court further exercised supplemental jurisdiction over Plaintiff-Appellant Scarlett Pavlovich's other claims under 28 U.S.C.S. § 1367.

This Court has jurisdiction to hear this appeal as it is an appeal of a final decision of a district court under 28 U.S.C. § 1291. The judgment to be reviewed was signed on October 3, 2025. Notice of appeal was given that same date. The judgment was final for purposes of appellate review because it effectively ends Plaintiff-Appellant's ability to litigate the matter within the Western District of Wisconsin. *See Mostly Memories, Inc. v. For Your Ease Only, Inc.*, 526 F.3d 1093, 1097 (7th Cir. 2008) (holding that a dismissal without prejudice for forum *non conveniens* that does not permit refiling within the same circuit is a final order for purposes of Section 1291).

Defendant-Appellee Neil Gaiman ("Gaiman") is a subject of the United Kingdom with a permanent residency in the United States of America and a resident of the Western District of Wisconsin.

Plaintiff-Appellant Scarlett Pavlovich ("Scarlett") is a citizen of New Zealand but resides in the United Kingdom.

## STATEMENT OF THE ISSUES

1. Pursuant to the rule articulated by the Supreme Court in *RJR Nabisco v. European Community*, 579 U.S. 325 (2016), the presumption against extraterritoriality is overcome where a statute indicates that it is meant to have extraterritorial effect. When Congress amended the Trafficking Victims Protection Act ("TVPA") in 2008, it added Section 1596, which expressly made certain offenses extraterritorial, and broadened Section 1595 – the statutory provision that created a private right of action – to allow any "individual who is a victim of a violation of" the TVPA to bring an action in an appropriate district court. For purposes of the motion to dismiss, there was no dispute that Scarlett was a victim of a violation of the TVPA, or that the conduct alleged would constitute an offense for which Congress had afforded the TVPA extraterritorial effect. Despite that, Gaiman moved to dismiss on the basis that the TVPA did not provide Scarlett a civil remedy because Gaiman's conduct occurred overseas. Does the TVPA allow a civil remedy for such conduct? The court below did not rule on this issue.

2. *Forum non conveniens* is a prudential doctrine that allows a court to "resist imposition upon its jurisdiction" where that jurisdiction is premised on "a general venue statute." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947). Assuming the Court agrees that the TVPA allows a civil remedy for conduct occurring overseas, Congress specifically directed that plaintiffs such as Scarlett be allowed to bring claims based on that conduct in U.S. courts. Did that specific directive from Congress limit the court's discretion to dismiss such claims based on *forum non conveniens*? The court below held that it did not.

3. *Forum non conveniens* dismissal requires the court to balance public and private interest factors to determine which of two alternative fora is more appropriate for the litigation. In assessing the public interest factors, the court below afforded no weight at all to the policy interests articulated by Congress when it enacted and reauthorized the TVPA. And in assessing

the private interests, the court below looked to the location of witnesses, evidence, and the parties without comparing the relative availability of those witnesses and evidence or the relative convenience of the two fora. Did the court below properly balance the interests in determining that litigation in New Zealand would be more convenient?

4. *Forum non conveniens* dismissal can only be made where the alternative forum proposed by the defendant is both available and adequate. A forum is not adequate if the remedy it provides is so inadequate or unsatisfactory as to be, as a practical matter, no remedy at all. New Zealand's accident compensation scheme does not allow plaintiffs with injuries of the type suffered by Scarlett to recover compensatory damages at all, and instead provides such plaintiffs only with free therapy to address their ongoing injuries. But that therapy can only be accessed in New Zealand, and Scarlett lives in Scotland. In these circumstances, is New Zealand an adequate alternative forum? The court below held that it was.

# STATEMENT OF THE CASE

Plaintiff-Appellant Scarlett Pavlovich brought this case against Defendant-Appellant Neil Gaiman for violations of the TVPA, civil conspiracy, conspiracy to commit trafficking, assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress, in the Western District of Wisconsin in cause number 3:25-cv-00078-jdp (*see* Complaint, Dkt. 2). Because Scarlett alleged that the actions giving rise to her suit occurred in New Zealand, Gaiman moved to dismiss on grounds of forum *non conveniens* (*see* Motion to Dismiss, Dkt. 18). Scarlett filed a response (see Response, Dkt. 36). On October 3, 2025, the district court entered an order granting the motion to dismiss without prejudice to refiling in New

Zealand, on the ground of forum *non conveniens* (*see* Order, Dkt. 51; *see also* Appendix, Tab 1).

Scarlett Pavlovich is merely the latest of Neil Gaiman's victims; Gaiman has a decades-long history of sexual misconduct. Complaint, ¶ 11. Scarlett met Defendant Gaiman's after befriending his wife, Amanda Palmer, in New Zealand. *Id.*, ¶¶ 20, 46. Scarlett was 22 years old, poor, without secure housing or a stable means of income, and in fragile mental health. *Id.*, ¶¶ 22, 30-35. Gaiman and his wife were celebrities with multiple homes on New Zealand's Waiheke Island. *Id.*, ¶ 39,40. Palmer was well aware of Scarlett's vulnerabilities, and informed Gaiman that Scarlett was vulnerable before introducing him to her. *Id.*, ¶¶ 36-37,92-94.

On February 1, 2022, Palmer asked Scarlett to babysit for both her and Gaiman for the weekend, watching their mutual child at their separate homes, for pay. Doc. No. 2, ¶¶ 38-39, 44. Scarlett arrived at Gaiman's house on the afternoon of February 4, 2022, spent an hour playing with Gaiman's child before Gaiman dropped the child at a friend's house, and then once Gaiman was alone with Scarlett, he sexually assaulted her. *Id.*, ¶¶ 46-49, 51-84.

After that first sexual assault, Gaiman instructed Scarlett to call him "Master," called her a "good little girl," and watched Scarlett attempt to clean herself off. *Id.*, ¶¶ 85-88. And Gaiman explained that Palmer had told him he could

not "have Scarlett," and that hearing that warning only fueled his desire. *Id.*, ¶¶ 89-93. Gaiman and Palmer then continued to use and abuse Scarlett for weeks, while failing to pay her for her work babysitting their son, either that day or over the next several weeks as a live-in nanny. *Id.*, ¶¶ 112-126. Scarlett remained dependent and trapped, and Gaiman proceeded to repeatedly sexually assaulted Scarlett in increasingly horrific ways, despite her multiple (and often screamed) protests. *Id.*, ¶¶ 127-182. Gaiman's conduct and mistreatment of Scarlett was so pervasive that his young son, imitating his father, began to call Scarlett "slave." *Id.*, ¶ 189.

During the time period Defendant Gaiman sexually abused Scarlett, between February 4, 2022, and February 25, 2022, Scarlett was not paid for her work as a nanny and for other household services she provided despite being employed by Defendant Gaiman and Defendant Palmer to provide said services. Scarlett fulfilled her required work obligations for several weeks, but Defendants failed to pay her for any of those services, which occurred during the time she was being sexually abused. Declaration of Scarlett Pavlovich (Dkt. 39), ¶ 11.

Not until February 26, 2022, when Defendant Gaiman left New Zealand, and traveled to Scotland, did the sexual abuse stop. But as of February 26, 2022, after enduring weeks of sexual abuse and preforming nanny services, Scarlett had received no compensation for the services she had completed. *Id.* ¶ 12.

## SUMMARY OF THE ARGUMENT

The district court should not have granted Gaiman's motion to dismiss for *forum non conveniens*. The district court did not sufficiently address the Trafficking Victims Protection Reauthorization Act, which specifically provides victims such as Scarlett a forum within the United States for redress for trafficking-related injuries even where the underlying conduct occurred outside the United States. In *Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019), the Fourth Circuit exhaustively addressed and rejected the argument that the TVPA's civil remedy did not apply to extraterritorial conduct. Multiple other courts have done the same. This Court should join those courts, and confirm that the TVPA allows plaintiffs such as Scarlett to bring civil claims under the TVPA based on extraterritorial conduct. And, because Congress specifically designated the U.S. courts as the appropriate venue for such claims, as part of the United States' policy interest in fighting international trafficking and in specific recognition that legal regimes in other countries are often insufficient to deter such conduct, the Court should find that *forum non conveniens* dismissal is entirely inapplicable to TVPA claims.

Regardless, the Court should reverse the district court's determination that *forum non conveniens* dismissal is appropriate in this case. The court below misapplied and mis-balanced the public and private interest factors, affording, for example, no

weight to the United States' statutorily articulated policy interest in adjudicating Scarlett's claims and far too much weight to the fact that documents Plaintiff can easily produce in the United States are nominally located in New Zealand. Properly understood and balanced, the private and public interest factors favored retention of jurisdiction, not dismissal. And, in any event, New Zealand is not an adequate alternative forum in Scarlett's unique circumstances, because under New Zealand law the only remedy it can provide her for her injuries – mental health treatment while she is physically in New Zealand, a place in which she does not live and to which she has no intention of returning – is tantamount to no remedy at all.

## ARGUMENT

### I. *Forum non conveniens* dismissal is reviewed for abuse of discretion, but the district court's legal conclusions are reviewed *de novo*.

Reviewing courts analyze a district court's *forum non conveniens* dismissal for abuse of discretion. *Deb v. SIRVA, Inc.*, 832 F.3d 800, 805 (7th Cir. 2016). A district court abuses its discretion when it makes an error of law, relies on clearly erroneous factual findings, or reaches a result that no reasonable jurist could reach on the record before it. *Instituto Mexicano del Seguro Social v. Zimmer Biomet Holdings, Inc.*, 29 F.4th 351, 357 (7th Cir. 2022). In evaluating the district court's discretion, a reviewing court must determine whether the court below properly

assigned the moving party the burden of "demonstrat[ing] that a finding of forum non conveniens was within the realm of appropriate conclusions." *Instituto Mexicano*, 29 F.4th at 358, *citing Deb*, 832 F.3d at 810. A legal error is an abuse of discretion by definition. *See United States v. Chaparro*, 956 F.3d 462, 474 (7th Cir. 2020). While the district court's factual findings are reviewed for clear error, this Court reviews its legal conclusions *de novo*. *See Martinez v. Bloomberg LP*, 740 F.3d 211, 216 (2d Cir. 2014).

## II.  <u>Congress's 2008 amendment to the TVPA deliberately opened United States courts to civil claims arising out of U.S. citizens' and residents' extraterritorial conduct.</u>

Congress enacted the TVPA in 2000 specifically to advance the United States' policy of combating the cross-border problem posed by international sex trafficking, and in recognition that laws and remedies in other jurisdictions could be insufficient to dissuade American citizens and permanent residents from engaging in such abuse while abroad. *See* 22 U.S.C. § 7101 (b)(14) – (17). In 2003, Congress amended the TVPA to, among other things, enable victims injured by violations of sections 1589, 1590, or 1591 to bring claims against their abusers in the United States if those abusers are American citizens or permanent residents. TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT OF

2003, PL 108–193, December 19, 2003, 117 Stat 2875, § 4 (adding 18 U.S.C. § 1595).

In 2008, Congress amended the TVPA to add 18 U.S.C. § 1596, a provision explicitly giving U.S. courts extra-territorial jurisdiction over violations and attempted violations of certain provisions of the TVPA. WILLIAM WILBERFORCE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT OF 2008, PL 110–457, December 23, 2008, 122 Stat 5044, § 223. And in the same amendment, Congress expanded the available civil remedies under the act to allow victims of *any* violation of the act[1] to recover against both the perpetrators and anyone who "knowingly benefits … from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." *Id.*, § 221.[2] Thus, at the same time as it expanded the scope of the TVPA's criminal provisions to encompass extraterritorial conduct, and thereby expanded the class of victims of TVPA violations to encompass international victims, Congress readopted and expanded 18 U.S.C. § 1595(a), which provides that "[a]n individual who is a victim of a

---

[1] Eliminating the previous language that had identified only violations of Sections 1589-91.

[2] *Cf.* Doyle, CONG. RESEARCH SERV., R40190, THE WILLIAM WILBERFORCE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT OF 2008 (P.L.110-457): CRIMINAL LAW PROVISIONS, p. 18-19 (2009) ("[e]ven though profiteering is only criminally proscribed with respect to" specific sections of the TVPA, the 2008 amendments section 1595 "create[] civil liability both for those who face criminal liability for their profiteering and those who do not").

violation of this chapter may bring a civil action ... in an appropriate district court of the United States ..." 18 U.S.C. § 1595(a).

Despite that clear Congressional directive, Defendant moved to dismiss below on the purported basis that the TVPA did *not* provide any civil remedy to victims injured abroad by American (or American-resident) sex traffickers. And, based on a misreading of *RJR Nabisco v. European Community*, 579 U.S. 325 (2016) and relying on a District of Columbia decision, *Mia v. Kimberly-Clark Corp.*, No. 22-cv-2353, 2025 WL 752564 (D.D.C. Mar. 10, 2025), which has had its reasoning heavily criticized and rejected both in the District of Columbia, *see Abernathy v. Carlyle Grp., Inc.*, No. CV 22-3603 (ABJ), 2024 WL 5331993 (D.D.C. Sept. 27, 2024) and in the District of Colorado, *see F.C. v. Jacobs Solutions Inc.*, 790 F.Supp.3d 1158, 1183 (D.Colo. Jun. 26, 2025), the district court suggested—without deciding—that the TVPA's civil remedy provision does not apply extraterritorially, clearing the way for its conclusion that forum non conveniens dismissal was appropriate. That was clear error, and this Court should reject that reasoning and follow *Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019), *Abernathy*, *Jacobs Solutions*, and the numerous other decisions which have correctly held (or simply

taken as a given) that Section 1595's civil remedy applies to extraterritorial conduct.[3]

## A. The TVPA clearly and unambiguously provides a civil remedy for extraterritorial conduct

A statute will be given extraterritorial effect when it "gives a clear, affirmative indication that it applies territorially." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 338 (2016). In *Roe* (the only appellate decision directly on point), the Fourth Circuit considered whether, under the *RJR Nabisco* test, the TVPA's private cause of action applied to extraterritorial conduct, ruling that it does. As the Fourth Circuit explained, Congress enacted the TVPA in 2000 to combat transnational human trafficking and sexual exploitation, creating "several new federal criminal offenses intended to more comprehensively and effectively" address the problem, including 18 U.S.C. §§ 1589, 1590, and 1591. *Roe*, 917 F.3d at 236. In 2003, Congress amended the statute to provide a civil remedy for violations of the TVPA, allowing "an individual who is a victim of a violation [to] bring a civil action against the perpetrator … in an appropriate district court of the United States." *Id.* (quoting 18 U.S.C. § 1595(a), alteration altered). In 2006, Congress expanded the TVPA's extraterritorial reach to conduct by government employees

---

[3] As discussed below, the district court's failure to adequately consider in its *forum non conveniens* analysis Congress's policy choice to open U.S. courts to claims based on extraterritorial conduct is fatal to the district court's opinion and warrants immediate reversal.

and contractors outside the United States, expanding the conduct that would be a "violation" allowing a victim to "bring a civil action against the perpetrator" in U.S. courts. *Roe*, 917 F.3d at 236-37. And in 2008, Congress further expanded its reach to cover any violation of Sections 1589-1591 anywhere in the world. *Id.*, 917 F.3d at 237. Applying the *RJR Nabisco* framework, the Fourth Circuit had little difficulty concluding that Congress intended the TVPA to apply extraterritorially and therefore displaced any contrary presumption that might otherwise limit 18 U.S.C. § 1595. *Roe*, 917 F.3d at 241:

> Of crucial importance, § 1595 directly incorporates predicate offenses that govern foreign conduct, providing strong textual evidence of its extraterritorial effect when applied to those predicates. … Additionally, the purpose, structure, history, and context of the TVPA militate toward the extraterritorial application of § 1595, to the extent that the relevant predicate offenses reach the challenged foreign conduct at issue.

*Id.* Thus, the Fourth Circuit was satisfied that "§ 1595 reflects congressional intent that it applies extraterritorially to the extent that a plaintiff seeks redress for a predicate offense that is itself extraterritorial." *Id.*, 917 F.3d at 242. Indeed, the TVPA pervasively references international issues and Congress enacted it as a "far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims." *Roe*, 917 F.3d at 242. Because Congress was "clearly concerned with

international rather than purely domestic matters… unduly limiting the TVPA's scope risks frustrating its animating purpose." *Id.*

Review of the statutory language confirms that the Fourth Circuit was correct. Section 1596, enacted as part of the 2008 amendments to the TVPA, expressly provides that the TVPA's prohibitions on peonage, slave-taking, slave-trading, forced labor, slave-trafficking, and sex-trafficking have extraterritorial effect. 18 U.S.C. § 1596(a). Indeed, Section 1596 provides for, essentially, universal jurisdiction over anyone who engages in such conduct anywhere in the world, allowing its enforcement not only against U.S. citizens or residents, 18 U.S.C. § 1596(a)(1), but also over violators who are only transiently within the United States. 18 U.S.C. § 1596(a)(2).

Section 1595(a), in turn, provides that "[a]n individual who is a victim of a violation of this chapter may bring a civil action." 18 U.S.C. § 1595(a). The current language of Section 1595(a) is *also* the product of Congress's 2008 amendment to the TVPA, which deliberately broadened the statute's civil remedy. Pub. L. 110–457, title II, § 223(a), Dec. 23, 2008, 122 Stat. 5071 (amending Section 1595(a) to delete the words "of section 1589, 1590, or 1591" from the previously enacted language providing a civil remedy only to victims of violations of those sections). That is, when Congress enacted the current version of Section 1595(a), which

16

provides a civil remedy to any victim of any violation of the TVPA, it did so *together* with expanding the effect of the TVPA to encompass victims and violations occurring entirely abroad. In other words, the facially broad scope of 1595(a) is not an accidental artifact of a subsequent change in the territorial reach of the TVPA's offenses; Congress did not broaden the jurisdictional reach of the TVPA without considering the impact of that amendment on the TVPA's civil remedy. Rather, Congress simultaneously amended both the TVPA's jurisdictional reach and its civil remedy, extending the TVPA to cover purely extraterritorial conduct while consciously and deliberately broadening the TVPA's civil remedy to victims of *any* violation, including violations of the TVPA for which Congress was simultaneously extending extraterritorial jurisdiction. No clearer textual signal could be asked for.

And that is also consistent with the overall purpose, structure, text, and extensive legislative history of the TVPA. Congress intended the TVPA to "address the problem of human trafficking throughout the world." *Roe*, 917 F.3d at 243. Congress found that trafficking is "a transnational crime with national implications," 22 U.S.C. § 7101(b)(24); *see also Jacobs Sols.*, 790 F.Supp.3d at 1183, and created far-reaching civil remedies to supplement criminal enforcement and provide victims with the means to recover damages for the harm caused by human trafficking. In 2000, when Congress passed the TVPA, it "repeatedly emphasized

the transnational nature" of the problem and the enforcement challenges posed by its international scope. *Roe*, 917 F.3d at 243. Congress then amended the statute in 2003 to add a private right of action given the challenges that remained "in responding to the needs of *victims of trafficking* in the United States *and abroad*." *Id.* at 236 (emphasis added). In 2006, Congress expanded the TVPA's extraterritorial reach to cover conduct by federal employees and contractors, and in 2008, Congress further expanded the TVPA to cover extraterritorial conduct by U.S. nationals or permanent residents—such as Gaiman. *Id.* at 237.

As the Fourth Circuit explained, this all makes clear that the civil remedy of Section 1595 was intended to be available to a foreign plaintiff injured by foreign conduct so long as the predicate offense is one that applies extraterritorially: "the TVPA represents a far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims." *Id.* at 242; *accord U.S. v. Baston*, 818 F.3d 651, 671 (11th Cir. 2016) (holding that "Congress has the power [under the Foreign Commerce Clause] to require international sex traffickers to pay restitution to their victims even when the sex trafficking occurs exclusively in another country").

Numerous other courts have reached the same conclusion. The Ninth Circuit recently devoted an opinion to determining whether the 2008 amendments

18

were retroactive, allowing civil claims for extraterritorial violations that occurred before 2008, or only allowed civil claims for extraterritorial violations occurring after 2008; there was no dispute that the civil remedy provision applied extraterritorially to violations occurring after 2008. *Ratha v. Rubicon Res., LLC*, 111 F.4th 946, 953 (9th Cir. 2024) (concluding that the provision was not retroactive), *reh'g en banc granted*, *opinion vacated*, No. 23-55299, 2025 WL 689487 (9th Cir. Mar. 4, 2025) (vacating to allow *en banc* consideration of retroactivity). *See also Adhikari v. KBR Inc.* (*Adikhari II*), No. 4:16-CV-2478, 2017 WL 4237923, at *5 (S.D. Tex. Sept. 25, 2017) (the 2008 amendments allow for such claims only based on post-2008 conduct); *Adhikari v. Daoud & Partners* (*Adikhari I*), 994 F. Supp. 2d 831, 840 (S.D. Tex. 2014) (concluding that the 2008 amendments created civil liability for extraterritorial conduct only on a going-forward basis), *aff'd sub nom Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 200 (5th Cir. 2017). *In U.S. ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 198 (D. Md. 2019), the District of Maryland allowed a civil claim brought pursuant to Section 1595 of the TVPA to proceed where it was based on conduct occurring in Kuwait. *Id*. at 197-199.19 In *Abernathy*, the District of Columbia held that the TVPA's civil remedies provision "applies extraterritorially to the extent that the offenses for which it supplies a private right of action have extraterritorial application." 2024 WL

5331993 at *13. And it did the same in *U.S. ex rel. Hawkins v. ManTech Int'l Corp.*, No. CV 15-2105 (ABJ), 2024 WL 4332117 (D.D.C. Sept. 27, 2024). (a companion case to *Abernathy* on the same facts, decided together by Judge Berman Jackson).

### B. RJR Nabisco's holding that RICO does not provide an extraterritorial civil remedy does not change the analysis.

Without analyzing the significant evidence that Congress intended the TVPA's civil remedy to apply to extraterritorial conduct, or the text of the TVPA itself, the district court concluded that *RJR Nabisco*'s holding that RICO had no extraterritorial civil effect was controlling because, it believed, RICO and the TVPA "appear[ed]" to have the same "structure" given that both included both criminal sanction and a civil remedy. *Pavlovich v. Gaiman*, No. 25-CV-78-JDP, 2025 WL 2819372, at *8 (W.D. Wis. Oct. 3, 2025). But that is straightforwardly wrong.

RICO's structure and the TVPA's structure are very different. In *RJR Nabisco*, the Supreme Court found it significant that Congress did not enact a private right of action governing *all* injuries a plaintiff might suffer as a result of a RICO violation, and concluded that "by cabining RICO's private cause of action to particular kinds of injury—excluding, for example, personal injuries—Congress signaled that the civil remedy is not coextensive with § 1962's substantive prohibitions." *RJR Nabisco*, 579 U.S. at 350. Similarly, the Court found that § 1964(c)'s "limit on RICO plaintiffs' ability to rely on securities fraud to make out a

claim" likewise indicated "that § 1964(c) is narrower in its application than § 1962." *Id.* Thus, because §1964(c) was narrower in its application than § 1962, the Court needed to look for specific language in § 1964(c) that extended its effect extraterritorially before it could conclude that the provisions shared the same territorial scope, and, finding none, could only apply the presumption against extraterritoriality. 579 U.S. at 350.

The TVPA, in contrast, *expressly* makes its civil and criminal provisions fully coextensive, creating a civil remedy for any individual who is a "victim of a violation of this chapter." 18 U.S.C. § 1595(a). In so doing, Congress provided the signal of extraterritorial effect that the Supreme Court found was not present in the RICO statute. This is precisely what the Fourth Circuit recognized in *Roe*: "[Section] 1595 directly incorporates predicate offenses that govern foreign conduct, providing strong textual evidence of its extraterritorial effect when applied to those predicates." 917 F.3d at 242.

But there is more. RICO's civil action provision identified a RICO injury as a necessary element of the claim: only victims "injured in [their] business or property by reason of a violation" could bring a claim. 18 U.S.C. § 1964(c). Thus, the question for the Court in *RJR Nabisco* was whether the "injury" required for a 1964(c) claim could be foreign, or whether the injury itself had to be domestic. 579

U.S. at 346. That RICO's predicate acts encompassed foreign conduct could not alone answer that question, because the RICO injury was a separate element of a civil action (and, as noted above, Congress had made clear the right to seek a civil remedy was not merely coextensive with RICO's substantive provisions). In the TVPA, however, Congress chose a different structure: It opened U.S. courts to any "victim of a violation of this chapter" – a class of persons in which Congress had expressly included victims of foreign conduct (like foreign corporations in the anti-trust context, *see* 579 U.S. at 352) when it made the TVPA's substantive provisions extraterritorial. *See* 18 U.S.C. 1595(a), 1596. The only question the Court need answer to determine whether Congress opened the courts to a TVPA plaintiff is thus whether that plaintiff is a "victim of a violation" of the TVPA. And Gaiman has conceded, for purposes of his motion to dismiss, that she is. Congress's choice to open the courts to civil claims by "victim[s] of a violation," without any other qualification or limitation, thus confirms that Congress made the TVPA's civil action available to Scarlett.

## III.   The court below erred when it dismissed Plaintiff's claim based on *forum non conveniens*

The order below should be reversed as an abuse of discretion, for several reasons. First, *forum non conveniens* is a prudential doctrine that allows a court to "resist imposition upon its jurisdiction" where that jurisdiction is premised on "a

*general* venue statute." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947)
(emphasis added). It can have no application at all to a claim that Congress
specifically designated as one to be heard in U.S. courts. *U.S. v. Nat'l City Lines*,
334 U.S. 573, 588–89 (1948) ("Congress' mandate regarding venue and the
exercise of jurisdiction is binding upon the federal courts. Our general power to
supervise the administration of justice in the federal courts, does not extend to
disregarding a validly enacted and applicable statute or permitting departure from
it, even in such matters as venue") (internal citations omitted). Thus, it was error
for the court below to rely on the doctrine to nullify Congress's directive in Section
1595(a) that extraterritorial TVPA claims were to be heard in this country's courts.
Second, even assuming that the doctrine could apply at all to TVPA claims such as
Plaintiff's, the court below erred in its analysis of the public and private interest
factors and in how it balanced those factors. And third, even were that not so, New
Zealand is not an adequate alternative forum.

**A.    The common law doctrine[4] of *forum non conveniens* has no application
       to TVPA claims.**

The court below erred in dismissing Plaintiff's claim in favor of an
international forum based on *forum non conveniens* because such dismissal is entirely

---

[4] Statutory transfer to another district pursuant to Section 1404 is not implicated by the TVPA and would
be permissible where applicable.

inapplicable to causes of action for which Congress specifically – rather than generally – opened U.S. courts to TVPA claims based on international conduct. In *Gilbert*, the Court explained that the doctrine allows federal courts to resist jurisdiction where a plaintiff brings a claim under a general jurisdiction statute (such as 28 U.S.C. §§ 1331 or 1332). 330 U.S. at 507. In *National City Lines*, decided the very next year, the Court held that where Congress had gone beyond general venue statutes to specifically allow particular causes of action to be brought in particular courts, the doctrine of *forum non conveniens* could have no purchase. 334 U.S. at 588 (given legislative history making clear that Congress deliberately allowed plaintiffs the venue in which they had brought the claim, "we cannot say that room was left for judicial discretion to apply the doctrine of forum non conveniens so as to deprive the plaintiff of the choice given by the section"). That was consistent with the principle the Court had articulated six years earlier, in a different context: that where Congress weighs the potential expense and inconvenience to parties of litigating in a particular forum, and opts to open that forum for suit on specific claims, it is not for the courts to decide that "the normal expense and inconvenience of trial in permitted places" is "inequitable and unconscionable." *Miles v. Illinois Cent. R. Co.*, 315 U.S. 698, 705 (1942) (statutory

prohibition on removal of FELA claim from state court also barred state court from enjoining such claims).

And that is particularly true in the case of the TVPA, a statute that, from its inception, was designed to address transnational concerns and whose reach Congress specifically made extraterritorial. The factors on which the court below primarily relied in its *forum non conveniens* analysis – the location of the conduct and witnesses – would apply to essentially *any* suit by a foreign victim arising out of foreign conduct, directly foreclosing the very remedy Congress sought to open for victims such as Scarlett. Multiple other Circuits have reached similar conclusions in connection with other federal laws, finding *forum non conveniens* categorically inapplicable. *See*, *e.g.*, *Zipfel v. Halliburton Co.*, 832 F.2d 1477, 1487 (9th Cir. 1987) (collecting cases and holding, like multiple other Circuits, that "the forum non conveniens doctrine should be unavailable as a ground for dismissal under the Jones Act as it is under the FELA"), *cert den'd* 486 U.S. 1054 (1988) and *modified on other grounds*, 861 F.2d 565 (9th Cir. 1988) (modifying ruling re injunctive relief based on intervening Supreme Court precedent); *La Seguridad v. Transytur Line*, 707 F.2d 1304, 1310 n. 10 (11th Cir. 1983) ("where Congress has given the federal courts a special responsibility to implement federal law, that duty will outweigh factors of convenience and mandate that the suit be heard. If federal law applies to

a case in which a forum non conveniens dismissal has been sought, the court must inquire further to determine if Congress has entrusted the federal courts with a special duty to implement that federal law, a duty mandating that the case should be heard. The court must ascertain if there is anything about the specific federal statute which indicates that Congress implicitly spoke to, and rejected, the application of forum non conveniens doctrine to a suit thereunder"), *abrogated on other grounds by Fresh Results, LLC v. ASF Holland, B.V.*, 921 F.3d 1043 (11th Cir. 2019) (court considering *forum non conveniens* must analyze public interest factors regardless of balance of private interest factors); *Indus. Inv. Dev. Corp. v. Mitsui & Co.*, 671 F.2d 876, 891 (5th Cir. 1982) (*forum non conveniens* dismissal not available on Sherman Act claims governing extraterritorial conduct because "Defendants cannot use the rules of *forum non conveniens* as a substitute for the rules concerning the extraterritorial application of the Act"), *cert. granted, judgment vacated sub nom. Mitsui & Co. v. Indus. Inv. Devlopment Corp.*, 460 U.S. 1007 (1983) (vacating for reconsideration of in light of subsequent Supreme Court decision altering standing analysis).[5] Simply put, the district court erred when it substituted its assessment of

---

[5] *See Indus. Inv. Dev. Corp. v. Mitsui & Co.*, 704 F.2d 785, 786 (5th Cir. 1983) ("Because of the Court's analysis of antitrust injury and the necessary causal connection between violation and injury for recovery, our discussion of standing at 671 F.2d 885–890 was faulty").

whether U.S. courts should be open to foreign plaintiffs suing over extraterritorial conduct for Congress's contrary directive. The dismissal must be reversed on that basis alone.

### B.  The district court erred in balancing the public and private interest factors.

To the extent that *forum non conveniens* dismissal can apply to TVPA claims at all, the district court erred in its analysis of the public and private interest factors and thus erroneously concluded that such dismissal was appropriate here. A court considering a *forum non conveniens* motion must first determine whether an alternative and adequate forum is available and then go on to balance the interests of the various participants. *Deb*, 832 F.3d at 805–07 (vacating forum non conveniens dismissal of claims by Canadian plaintiff regarding contract with Indian moving company for move of belongings from India to Canada).

The private interest factors include:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). The public interest factors include the administrative burden on the courts, the load on the jury system, the need to conduct trials involving matters of public interest in public, and the need to

have the trial of local matters close to home. *Id.*, at 508-09. Defendants bear a

heavy burden in opposing Plaintiff's chosen forum. *Sinochem Int'l Co. v. Malaysia*

*Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007). A federal court may only dismiss for

forum non conveniens when trial in the chosen forum would oppress and vex a

defendant out of proportion to the plaintiff's convenience. *American Dredging Co.*

*v. Miller*, 510 U.S. 443, 447-448 (1994). Here, the court below made several

significant missteps.

### 1.    The court below misapplied the public interest factors

First, the district court wholly misunderstood and misapplied the public

interest factors in light of Congress's decision to give the TVPA extraterritorial

effect. Incorrectly believing that the TVPA likely had no such effect, the court

below reasoned that the relevant interest here was merely the State's generalized

interest "in malfeasance by its citizens abroad." *Pavlovich*, 2025 WL 2819372 at *8.

*See also id.* at *6 (there are "no ripple effects that this case could have that would

implicate a United States interest"). But Congress has expressly articulated the

U.S. interest in preventing international trafficking that goes far beyond a

generalized interest in avoiding malfeasance by its citizens, and with which the

28

court below simply did not engage at all. [6] *See* Pub. L. 106–386, § 102(a)-(b), Oct. 28, 2000, 114 Stat. 1489 (2000) (detailed Congressional findings articulating the United States' interest in preventing international trafficking); Pub. L. 108–193, §2, Dec. 19, 2003, 117 Stat. 2878 (2003) (additional Congressional findings supporting 2003 amendments to the TVPA, including the creation of the private right of action, and discussing victims of trafficking "in the United States *and abroad*") (emphasis added). That strong national interest should have been afforded significant weight in any *forum non conveniens* analysis; instead, it was given none.[7]

That error was particularly significant in light of the undisputedly minimal potential legal consequences Gaiman would face in New Zealand, a problem that was of specific concern to Congress when it enacted the TVPA in the first instance:

> Existing legislation and law enforcement in the United States *and other countries* are inadequate to deter trafficking and bring traffickers to justice, *failing to reflect the gravity of the offenses involved*. No comprehensive law exists in the United States that penalizes the range of offenses involved in the trafficking scheme. Instead, *even the most brutal instances of trafficking in the sex industry are often punished*

---

[6] The U.S. interest in preventing international trafficking was so important that Congress amended the statutory scheme twice to ensure that victims of human trafficking would have a civil remedy for violations of the Act in an American court.

[7] The court below's suggestion that the public interest factors favored dismissal because "Wisconsin jurors would be scratching their heads about how and why they were being asked to decide a dispute regarding such far away events," does not withstand scrutiny. Federal courts routinely adjudicate disputes arising from foreign conduct—antitrust cases, FCPA matters, securities fraud, and human rights litigation under the Alien Tort Statute and TVPA all involve foreign events. And we trust juries around the country to understand and decide patent infringement litigation, often involving foreign infringers and inventors.

*under laws that also apply to lesser offenses, so that traffickers typically escape deserved punishment.*

Pub. L. 106–386, § 102(b)(14) (emphasis added). This is a case, then, where the public interest factors weigh strongly in favor of retaining jurisdiction, because dismissal would work the very evil Congress sought to address when it enacted the statute under which Plaintiff brings her claim. *Cf. Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 339 (S.D.N.Y. 2003) (citing "the strong United States interest in vindicating international human rights violations" as militating against *forum non conveniens* dismissal of Alien Tort Statute action).

2.    <u>The court below misapplied the private interest factors.</u>

The court below also mis-analyzed the private interest factors, primarily because it failed to compare the convenience of litigating in the U.S. to the convenience of litigating in New Zealand. The private interest analysis focuses on the relative convenience to the parties of litigating in the two alternative fora. *Kamel v. Hill-Rom Co., Inc*, 108 F.3D 799, 803-04 (7th Cir. 1997). But the court below engaged in no real comparative analysis.

For instance, the district court found that the location of witnesses favored litigation in New Zealand, because a Wisconsin district court could not compel New Zealand-based witnesses to appear and, if compulsion were necessary, the parties would need to seek an order from a New Zealand court. *Pavlovich*, 2025 WL

2819372 at *6. But the undisputed testimony from Plaintiff's expert was that depositions of witnesses could be had to the same extent that such a request could be granted in New Zealand civil proceedings. *See* Dkt. 38-1 at 22, ¶ 45. Proceeding in New Zealand thus would not increase Gaiman's access to witnesses at all; regardless of where the litigation proceeds, discovery from such witnesses would require an application to the New Zealand courts. And, in any event, Appellee provided no evidence whatsoever that his proposed witnesses – his friends and employees, *see* Dkt. 19, pg. 14 – would require compulsion in the first instance, rendering this factor irrelevant. *See Shi v. New Mighty U.S. Tr.*, 918 F.3d 944, 951 (D.C. Cir. 2019) ("The Trusts do not suggest they will be unlikely to persuade their proposed witnesses located abroad — the 'Trust Managers' and other of Y.C.'s companies' employees — to appear voluntarily in a U.S. court, weighing against dismissal"); *Duha v. Agrium, Inc.*, 448 F.3d 867, 877 (6th Cir. 2006) ("When no witness' unwillingness has been alleged or shown, a district court should not attach much weight to the compulsory process factor").

More, the court below was wrong to conclude that all of the key witnesses are subject to the jurisdiction of New Zealand's courts. Amanda Palmer – *the* key witness other than the parties, and far more central to the claims than the grab-bag of supposed character witnesses the district court thought might be relevant to

assessing Plaintiff's credibility, 2025 WL 2819372 at *6[8] – no longer lives in New Zealand and is not subject to compulsory process there. And while Ms. Palmer has moved for *forum non conveniens* dismissal of Plaintiff's companion claims against her, arguing for a New Zealand forum, Plaintiff's claims against Palmer are available only under American law, because New Zealand has barred private litigation of such claims in favor of an administrative scheme. *See* Dkt. 38-1, Report of Jack Wass, p. 7, ¶ 2.11. Thus, even if the District of Massachusetts dismisses the claims against Palmer based on *forum non conveniens* (which is no certainty), Palmer would not have to appear in New Zealand to defend any lawsuit and there is therefore no guarantee that Plaintiff would be able to obtain Palmer's testimony for use in any further proceedings against Gaiman. Indeed, unlike Gaiman's witnesses, there is evidence that Palmer would not make herself willingly available to Scarlett and therefore that compulsory process would be necessary: Palmer previously refused to speak to the New Zealand police. Complaint, ¶ 253. And, of course, if the District of Massachusetts retains jurisdiction, dismissing the Gaiman case to New Zealand guarantees the fragmentation the district court purported to avoid.

---

[8] Without any specifics, the court below hypothesized that witnesses *might* contest potential testimony from Plaintiff about where she was on particular days or other matters. *Id.* Respectfully, the same is true of foreign witnesses in *any* case – someone, somewhere, might be able to testify to something that contradicts a party's future testimony on some issue. If *that* level of abstraction is sufficient, then there is no case in which the existence of any foreign witness does not support dismissal.

Thus, for the core claims and core relevant witnesses, litigating Scarlett's claims against Gaiman in Wisconsin would be significantly more convenient than litigating them in New Zealand.

The court below's treatment of the location of relevant evidence suffers from the same problem. The court below noted that Gaiman asserted that Plaintiff's medical and financial records are in New Zealand and therefore ruled that he had met his burden of "identifying … categories of evidence that are located in New Zealand and are likely to be relevant." 2025 WL 2819372 at *6. But *Plaintiff's* medical and financial records are – obviously – entirely available to Appellee in U.S. litigation! She is a party to the action, her records are in her possession, custody, and control, and must be produced in discovery. That Appellant's documents that would be unquestionably available to Appellee if the litigation proceeded in the United States are physically located in another jurisdiction self-evidently does not make litigating in that other jurisdiction more convenient.

In effect, the court below treated the private interests analysis as a box-checking exercise, asking where witnesses and evidence was located rather than sufficiently focusing on what that meant for the comparative convenience of litigating in Wisconsin versus litigating in New Zealand. Perhaps nowhere was that

more clear than in the district court's treatment of the location of the parties. Appellee is a Wisconsin resident. Appellant is a resident of Scotland who submitted evidence that, as a practical matter, litigating in Wisconsin was significantly more convenient for her than litigating in New Zealand would be. *See* Dkt. 37, p. 3. Indeed, given the time difference between New Zealand and Scotland, litigating in New Zealand would impose significant additional practical hardship on Appellant. *Id*. But the court below addressed none of that, simply waving it away on the theory that both New Zealand and Wisconsin are "thousands of miles away" from her residence. 2025 WL 2819372 at *6. The court below's refusal to analyze the practical differences that litigating in each of the fora would impose on the litigants was an abuse of discretion, and one that poisoned its entire analysis. *See Salebuild, Inc. v. Flexisales, Inc.*, 633 F. App'x 641, 643 (9th Cir. 2015) (location of witnesses irrelevant "in this age of robust video conferencing technology"); *Lynn v. Becton Dickinson & Co.*, No. 2:21-CV-5004, 2022 WL 610819, at *4 (S.D. Ohio Mar. 2, 2022) ("The location of witnesses similarly carries little weight given the widespread availability of video conferencing"); *Fruitstone v. Spartan Race Inc.*, 464 F. Supp. 3d 1268, 1282 (S.D. Fla. 2020) (location of documents "virtually irrelevant" given realities of electronic production).

3. <u>The court below improperly balanced the public and private interest factors and the interests of justice</u>

Given its errors analyzing the public and private interest factors, it is unsurprising that the district court erred in how it balanced those factors. As discussed above, the public interest factors strongly favor retention of jurisdiction, given the United States' strong public policy interest in adjudicating international trafficking cases and ensuring robust compensation for victims of such trafficking and vigorous punishment of its perpetrators. The private interest factors, meanwhile, either favor retention of jurisdiction (given the lack of practical impact on the availability of the witnesses Gaiman identified, the centrality of Palmer's testimony and her potential unavailability in New Zealand, and the private convenience of the parties given their locations and resources) or, at best for Appellee, slightly favor litigation in New Zealand (if the court assigns the location of Appellee's hoped-for character witnesses meaningful weight and presumes, for some reason, that compulsory process would be required). In these circumstances, the overall balance cannot tip decidedly in favor of dismissal, as would be required to justify the ruling below. More, the interests of justice strongly favor retention of jurisdiction in the United States to allow Plaintiff to bring her TVPA claim, rather than dismissal in favor of a jurisdiction with laws that fail "to reflect the gravity of the offenses involved" and would thereby allow Gaiman to "escape deserved

punishment" despite the "brutal" nature of his conduct. Pub. L. 106–386, § 102(b)(14). *Cf. Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981) (inadequacy of remedy relevant to the interests of justice). Properly balancing the relevant interests, the motion should have been denied.

### C.     New Zealand is not an adequate alternative forum because it provides no meaningful remedy for Scarlett's injuries.

Finally, the district court erred when it held that New Zealand was an adequate alternative forum.  While the standard is whether the alternative forum provides "some remedy," *see Piper Aircraft*, 454 U.S. at 255 n.22, the Supreme Court also recognized that under some circumstances a remedy might be so "unsatisfactory" as to be no remedy at all. *Id.* at 254. *See also Sector Navigation Co. v. M/V CAPTAIN P*, No. CIV A 06-1788, 2006 WL 2946356 (E.D. La. Oct. 13, 2006) ("[i]f the language in *Piper* means anything, then there must be some level at which a remedy, although available, becomes 'so clearly inadequate or unsatisfactory that it is no remedy at all'"). The district court's own findings demonstrate that Scarlett will receive no meaningful remedy in New Zealand, and as a result, this Court should also reverse on the basis that New Zealand is not an adequate alternative forum.

First, the court below fundamentally erred when it found that compensatory damages are available to Appellant. *See* 2025 WL 2819372 at *4 ("Pavlovich seeks

damages for harm caused by sexual and physical assaults, and New Zealand provides remedies for such harm, including compensatory and punitive damages"). The undisputed expert testimony established that no compensatory damages could be awarded to Appellant under New Zealand law – only mental health treatment through the Accident Compensation Corporation. *See* Dkt. 38-1, pgs. 3-4. Indeed, the court below acknowledged that Appellant no longer qualifies for that remedy, because she moved to the United Kingdom, but dismissed that as an issue by noting that: (1) Appellant had already received some treatment before leaving New Zealand, and (2) the remedies need not be as "comprehensive" as those available in the United States. 2025 WL 2819372 at *4. But Appellant's *past* treatment is not an adequate remedy for her *ongoing* mental health injuries stemming from Gaiman's brutal sexual assaults. As to those ongoing injuries, and as a factual matter, New Zealand would provide Appellant "no remedy at all." *Piper Aircraft*, 454 U.S. at 254. The question is not whether Scarlett received some benefit in the past, but whether she can obtain any remedy for her injuries going forward if she pursues her claims in New Zealand. And it is undisputed that she cannot.[9]

---

[9] The absence of *any* compensatory remedy for Appellant's injuries distinguishes this case from others in which limitations on damages or administrative schemes, including New Zealand's Accident Compensation Corporation, were found to be adequate for *forum non conveniens* purposes. *See Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1144 (9th Cir. 2001) ("the losses for which Plaintiffs seek compensation are their physical injuries … New Zealand, through its no-fault accident compensation scheme, has provided and continues to provide a remedy for Plaintiffs' losses"); *Flack v. Nutribullet, L.L.C.*, No. 218CV05829DDPSSX, 2018 WL 6330421, at *3 (C.D. Cal. Dec. 4, 2018) ("New Zealand provides an administrative remedy for the

The district court also appeared to blame Appellant for the absence of any remedy, noting that treatment was "discontinued only because of Pavlovich's decision to leave New Zealand." 2025 WL 2819372 at *4. But Appellant had no obligation to remain indefinitely in the country where she was assaulted—living without the support of friends or family and unable to provide for her basic needs—in order to preserve the adequacy of the only legal remedy New Zealand chose to offer.[10]

Nor does the availability of a civil action for exemplary damages for "truly outrageous conduct" impact that analysis. Punitive damages do not exist to compensate or make whole the plaintiff; they are therefore not an adequate compensatory remedy. Punitive damages are aimed at deterrence and retribution; as their name suggests, they are to punish the wrongdoer, not compensate the

---

alleged personal injuries in this case"); *In re Am. Med. Sys., Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, No. 2:13-CV-19418, 2014 WL 637189, at *3-4 (S.D.W. Va. Feb. 18, 2014) ("Under the Act, an individual can obtain damages for covered injuries … the New Zealand plaintiffs qualify for cover under the Accident Compensation Act"); *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 887 F. Supp. 1469, 1475 (N.D. Ala. 1995) (injuries at issue were "compensable … under a regulatory system …"); *Stonnell v. Int'l Harvester Co.*, 132 Ill. App. 3d 1043, 1045, 478 N.E.2d 518, 520 (1985) (plaintiffs' "allegations, if proved, may entitle plaintiffs to compensation" under the Accident Compensation scheme). Indeed, given her circumstances, Scarlett is most akin to the plaintiffs for whom the *Silicon Gel* court found New Zealand would be an inadequate forum, because New Zealand law would not afford those specific plaintiffs any remedy. 887 F. Supp. at 1475.

[10] Appellant's decision to leave New Zealand might have some conceivable relevance to an unclean hands ruling had the court found that she had chosen to move to Scotland in order to render New Zealand an inadequate forum for purposes of a *forum non conveniens* motion. Of course, she did nothing of the sort and the court below did not find that she did. In the absence of that, the district court was not free to disregard the *factual* inadequacy of the remedy offered by New Zealand on the theory that the remedy would be adequate for a different plaintiff in different circumstances.

plaintiff. *See Huff v. White Motor Corp.*, 609 F.2d 286, 297 (7th Cir. 1979) ("Punitive damages 'are not compensation for injury. Instead, they are private fines levied by civil juries…'"), *quoting Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 48 (1979). So the existence, likelihood, or validity of punitive damages should never have factored into the district court's analysis when determining whether New Zealand provided an adequate remedy to Scarlett. *See Piper*, 454 U.S. at 254 ("[I]f the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight.").

Second, New Zealand is also unavailable because any action Scarlett might file in New Zealand would subject her, before her claims could proceed, to an order requiring security for Gaiman's costs of defense should he succeed. Appellant is a student with few if any assets and would not be able to provide security for costs. She definitively cannot litigate any of the claims she has pled in her Complaint in New Zealand. As such, it is not an available alternative forum. *See Domanus v. Lewicki*, 645 F. Supp. 2d 697, 702 (N.D. Ill. 2009) (Poland not an available forum where it did not recognize plaintiffs' causes of action).

# CONCLUSION

Therefore, for all of the foregoing reasons, the decision of the district court is in error and subject to reversal and remand from this Court. Plaintiff-Appellant Scarlett Pavlovich respectfully prays that this Court grant her the relief requested.

SUBMITTED BY:
/s/Lane Andrew Haygood
Kamerman, Uncyk, Soniker & Klein, P.C.
1700 Broadway
New York, NY 10019
Texas Bar No. 24066670
432.279.0411
lhaygood@kusklaw.com

# CERTIFICATE OF SERVICE

I certify that on November 28, 2025, the foregoing document was forwarded via electronic filing on today's date to the following parties/counsel:

Andrew B. Brettler
Steven Kravit
Brian T. Fahl

/s/Lane Andrew Haygood
Lane A. Haygood
Attorney for Scarlett Pavlovich

# CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 7ᵗʰ CIR. R. 32.1:  this document contains 9,585 words.

2.  This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 7ᵗʰ CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 in Matthew Butterick's Equity font in size 14-point.

/s/Lane Andrew Haygood
Lane A. Haygood
Attorney for Scarlett Pavlovich

# APPENDIX

Decision Below ................................................................................. Tab 1

## REQUIRED CERTIFICATE

This document complies Circuit Rule 30(d), in that all materials required by Circuit Rule 30(a) and (b) are included in this appendix, specifically in that it includes the order under review, which granted the Defendant-Appellee's motion to dismiss on grounds of forum non conveniens without prejudice to refiling in New Zealand. Additionally, counsel certifies that that no materials covered by Circuit Rule 30(b) were identified in the record as necessary for resolution of this appeal, since it involves narrowly only the district court's decision reproduced as Tab 1.

Signed on December 1, 2025.


/s/Lane Andrew Haygood
Lane A. Haygood
Attorney for Scarlett Pavlovich

# TAB 1 – Order Below

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SCARLETT PAVLOVICH,

                              Plaintiff,                          OPINION and ORDER

    v.
                                                                 25-cv-78-jdp
NEIL GAIMAN,

                              Defendant.

---

Plaintiff Scarlett Pavlovich worked as defendant Neil Gaiman's nanny for a short time in 2022. Pavlovich alleges that Gaiman used the promise of a job to sexually assault her numerous times over the span of a few weeks. She asserts claims under the Trafficking Victims Protection Act (TVPA) as well as state common law.

Pavlovich's allegations are serious and disturbing, depicting Gaiman as predatory, cruel, and sadistic. Gaiman denies Pavlovich's allegations, but the issue before the court is not whether Pavlovich's allegations are true. Rather, Gaiman moves to dismiss the case on procedural grounds, and he asserts two primary arguments. First, he says that the case does not belong in the United States because all of the alleged conduct occurred while both parties were living in New Zealand, where Pavlovich is a citizen and Gaiman has permanent residency status. Second, he says that the civil enforcement provisions of the TVPA do not apply to extraterritorial conduct, and the court should not exercise supplemental jurisdiction over the state-law claims.[1]

---

[1] Gaiman also contends that Pavlovich should be required to exhaust her administrative remedies and that the court should abstain under comity principles. The court need not consider these issues.

Both arguments have merit, but the first issue is dispositive, so it is not necessary to resolve the second. The only connection that Wisconsin or the United States has with this lawsuit is that Gaiman has a residence in this state and he may live here currently. All of the relevant events occurred in New Zealand, Pavlovich is a New Zealand citizen, both parties were living in New Zealand during the relevant time, all relevant evidence and most potential witnesses are located in New Zealand. Gaiman and Amanda Palmer (Gaiman's wife) now live in the United States, but both of them have agreed to accept service in New Zealand.[2] Under these circumstances, it is clear that New Zealand is the more appropriate forum for resolving this dispute, so the court will dismiss the case without prejudice. If Pavlovich sues Gaiman in New Zealand, and he refuses to accept service there, Pavlovich may move to reopen this case.

## BACKGROUND

The following allegations are taken from the complaint and Pavlovich's declaration. The court accepts the allegations as true for the purpose of Gaiman's motion to dismiss. The court may look outside the complaint when deciding a motion to dismiss based on the forum non conveniens doctrine, *Deb v. SIRVA, Inc.*, 832 F.3d 800, 809 (7th Cir. 2016), but Gaiman does not dispute any facts related to determining the appropriate venue. He disputes Pavlovich's allegations of misconduct, and he submits text messages that he says exonerate him, but that evidence is not relevant to the motion to dismiss, so the court has not considered it.

---

[2] Pavlovich originally named Palmer as a defendant, alleging that she conspired with Gaiman to engage in human trafficking, but Pavlovich has since dismissed Palmer, Dkt. 40, and is proceeding in a separate lawsuit against Palmer in Massachusetts, where Palmer resides. *See Pavlovich v. Palmer*, No. 25-cv-10263 (D. Mass. filed Feb. 3, 2025). Palmer has also moved to dismiss that case on the ground that it belongs in New Zealand. *Id.*, Dkt. 16.

Pavlovich is a New Zealand citizen. In 2020, she met Gaiman's wife Amanda Palmer in New Zealand, where both Palmer and Gaiman were living. Pavlovich does not say how she met Palmer, only that she would "sometimes do personal tasks for Palmer, such as running errands, babysitting, or helping with household chores." Dkt. 2, ¶ 28. Pavlovich was 22 years old at the time and "economically insecure." *Id.* ¶ 30. Gaiman and Palmer were living in New Zealand in separate houses on Waiheke Island, which is 16 miles from Auckland and accessible by public ferry. Gaiman is a citizen of the United Kingdom, but he has permanent resident status in New Zealand.

 Pavlovich did not meet Gaiman until February 2022. He sexually assaulted her during their first meeting while she was supposed to be babysitting his child. The assault occurred at Gaiman's home on Waiheke Island after Gaiman directed Pavlovich to remove her clothes and get in a bathtub. Gaiman got in the bathtub with her, digitally penetrated her rectum and ejaculated on her face despite her objections.

A few days later, Pavlovich accepted Palmer's offer for a job as Gaiman and Palmer's live-in nanny. Pavlovich was "desperate for secure employment and affordable housing." *Id.* ¶ 116.

Pavlovich worked as Gaiman and Palmer's nanny for only about three weeks. Gaiman assaulted her repeatedly during that time, both sexually and physically. These assaults included "forcible sodomy" that caused Pavlovich "severe" and "overwhelming" pain, *id.* ¶¶ 140–41, and oral sex that caused her to vomit. He also choked her, struck her genitals with a belt, and forced her to lick urine off his hand.

Pavlovich did not leave because she "could not easily afford transport off the island," and she had nowhere else to go. *Id.* ¶¶ 201–09. She had not yet been paid for her services as a nanny.

After a few weeks, Gaiman left New Zealand for Europe, and he took his child with him. Pavlovich then moved back to Auckland and she sought psychiatric care after she began contemplating suicide. In late March 2025, Gaiman paid Pavlovich for her work as a nanny.

Pavlovich filed a complaint with the police against Gaiman in New Zealand, but the police "took no action because Palmer refused to talk to them." *Id.* ¶ 253.

Pavlovich currently lives in the United Kingdom where she is attending university. Gaiman lives in Menomonie, Wisconsin. He has permanent residency status in the United States.

## ANALYSIS

Gaiman moves to dismiss this case under the doctrine of forum non conveniens, which applies "when [the court] determines that there are strong reasons for believing [the case] should be litigated in the courts of another, normally a foreign, jurisdiction." *Deb*, 832 F.3d at 805. The forum non conveniens analysis proceeds in two steps. First, the moving party must show that an alternative forum is both "available" and "adequate." *Stroitelstvo Bulgaria Ltd. v. Bulgarian-Am. Enter. Fund*, 589 F.3d 417, 421 (7th Cir. 2009). Second, if the moving party makes that showing, the court weighs various factors related to both the private and public interest, such as the relative burdens of litigating in each forum and the relationship that each forum has with the dispute. *See Instituto Mexicano del Seguro Soc. v. Zimmer Biomet Holdings, Inc.,*

29 F.4th 351, 357 (7th Cir. 2022). The decision whether to dismiss a case on forum non conveniens grounds is committed to the discretion of the district court. *Deb*, 832 F.3d at 805.

For the reasons below, the court concludes that New Zealand is an available and adequate forum and that the private and public interest factors show that New Zealand is a more appropriate forum for resolving this dispute.

## A. Availability and adequacy of remedy in New Zealand

An alternative forum is available if all of the parties are amenable to process and within the forum's jurisdiction. *Stroitelstvo*, 589 F.3d at 421. In this case, there is no dispute that both Pavlovich and Gaiman are amenable to process in New Zealand, so the court need not analyze that issue for them.

An alternative forum is adequate if it provides the plaintiff with a "fair hearing to obtain some remedy for the alleged wrong." *Id.* In this case, Pavlovich's New Zealand law expert summarizes the remedies available to Pavlovich in New Zealand, Dkt. 38-1:

- Parties may not file civil lawsuits seeking compensatory damages for torts. Instead, a party may seek compensatory damages under the New Zealand Accident Compensation Act, which creates an administrative process that does not assign fault to either party. Although the law refers to "accidents," the law encompasses intentional torts as well.

- Parties may not recover damages for emotional injuries. Instead, they may receive certain "rehabilitative entitlements," including mental health treatment.

- Parties may file civil lawsuits for exemplary or punitive damages when another party engages in "truly outrageous conduct."[3]

Gaiman does not dispute this summary for the purpose of his motion to dismiss, so the court will assume that the summary is accurate.

Pavlovich contends that New Zealand's remedies are not adequate because they do not allow civil lawsuits for compensatory damages, they do not recognize a civil cause of action for human trafficking, and Pavlovich cannot obtain any remedy for mental injury because the only remedy offered is treatment and that is limited to individuals who reside in New Zealand. All of these objections fail. A remedy is not inadequate simply because it is not as robust or is less favorable than the remedy the plaintiff could obtain in the United States. Rather, the question is whether this is one of the "rare circumstances" in which "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 245, 255 n.22 (1981).

The limitations that Pavlovich identifies in New Zealand's remedies are not the equivalent of "no remedy at all." Courts have rejected arguments that the same types of limitations render a remedy inadequate.

As for the requirement to seek compensatory damages through an administrative process rather than a lawsuit, "nonjudicial modes of dispute resolution are common, and proper if adequate, as they often are." *Veljkovic v. Carlson Hotels, Inc.*, 857 F.3d 754, 756–57 (7th Cir.

---

[3] It is also undisputed that the conduct alleged in the complaint violates New Zealand criminal law against human trafficking and that Pavlovich could receive monetary "reparations" if Gaiman were convicted. *See* Dkt. 38-1, § 2.31. Neither party cites authority on whether the court may consider remedies that could be obtained through criminal law, so the court will not consider that issue.

2017). In support of that conclusion, the court in *Veljkovic* cited *Lueck v. Sundstrand Corp.*, 236 F.3d 1137 (9th Cir. 2001), in which the court considered whether New Zealand's Accident Compensation Act provided an adequate remedy for tort victims. The court in *Lueck* concluded that the source of the remedy was irrelevant and that the administrative remedies provided under the Act were adequate. Other courts have reached the same conclusion, both about the adequacy of administrative remedies generally, *see Imamura v. Gen. Elec. Co.*, 957 F.3d 98, 111 (1st Cir. 2020); *Tang v. Synutra Int'l, Inc.*, 656 F.3d 242, 250–51 (4th Cir. 2011), and the adequacy of remedies under New Zealand's Accident Compensation Act specifically, *see Flack v. Nutribullet, L.L.C.*, No. 218CV05829DDPSSX, 2018 WL 6330421, at *3 (C.D. Cal. Dec. 4, 2018); *In re Am. Med. Sys., Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, No. 13-CV-19418, 2014 WL 637189, at *3–4 (S.D.W. Va. Feb. 18, 2014); *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 887 F.Supp. 1469, 1475 (N.D. Ala. 1995); *Stonnell v. Int'l Harvester Co.*, 478 N.E.2d 518 (Ill. Ct. App. 1985). Pavlovich cites no contrary authority.

As for the lack of a civil cause of action for human trafficking in New Zealand, the alternative forum does not need to "support the full array of legal claims" that the plaintiff could assert in the United States. *Stroitelstvo,* 589 F.3d at 422. Rather, the question is whether the remedy provided by the alternative forum covers the "subject matter of the dispute." *Piper Aircraft,* 454 U.S. at 255 n.22. In this case, Pavlovich seeks damages for harm caused by sexual and physical assaults, and New Zealand provides remedies for such harm, including

compensatory and punitive damages.[4] Pavlovich does not identify any harms caused by the alleged trafficking that are distinct from the harms caused by the alleged assaults.

As for the limitations on remedies for emotional injuries, Pavlovich says she will be left without any remedy because the only remedy New Zealand provides is mental health treatment, but she does not qualify for that because she now lives outside New Zealand. She cites a letter that she says is from "a therapist who works with the ACC [Accident Compensation Corporation]." Dkt. 39-1. The letter states that "we can't continue ACC-funded therapy when you're living overseas." *Id*. The letter is hearsay, but even if the court assumes that Pavlovich no longer qualifies for treatment, that is not enough to show that New Zealand is an inadequate forum, for two reasons. First, the letter suggests that Pavlovich was receiving free mental health treatment through July 2024, and that treatment was discontinued only because of Pavlovich's decision to leave New Zealand. So Pavlovich has already received a remedy for her mental injuries. Second, just as the alternative forum need not create a cause of action identical to the United States, the alternative forum can be adequate even if the remedies provided are not as "comprehensive or as favorable as the claims a plaintiff might bring in an American court." *Stroitelstvo*, 589 F.3d at 421. The remedies provided by New Zealand are substantial, and that is enough. *See Veljkovic,* 857 F.3d at 756–57.

---

[4] Pavlovich's legal expert questions how often punitive damages are awarded for sexual assault in New Zealand. Dkt. 38-1, § 2.17. But the expert does not contend that punitive damages are unavailable if a sexual assault victim can meet the legal standard. The court does not scrutinize the likelihood of a plaintiff's success in the alternative forum, so long as there is "some potential avenue for redress." *Stroitelstvo*, 589 F.3d at 423–24; *see also id.* (Bulgaria was an adequate forum despite possibility that Bulgarian courts would not recognize claims asserted by some of the defendants); *Instituto Mexicano*, 29 F.4th at 358–59 (Mexico was an adequate forum even if success was "less likely" for the plaintiff there based on the possibility that "Mexican courts are . . . unwilling[] to address the responsibility of foreign parents of Mexican agents") (internal quotation marks omitted).

## B. Public and private interest factors

The court's remaining task is to weigh the factors for and against dismissal for forum non conveniens. A threshold question is how much deference the court must give to Pavlovich's choice of forum. When the plaintiff is suing in her home forum, "a plaintiff's choice of forum should be disturbed only if the balance of public and private interest factors strongly favors the defendant." *Clerides v. Boeing Co.*, 534 F.3d 623, 628 (7th Cir. 2008). But "the presumption in the plaintiff's favor applies with less force" when "the plaintiff is suing far from home." *In re Factor VIII or IX Concentrate Blood Products Litigation*, 484 F.3d 951, 955–56 (7th Cir. 2007). When, as in this case, a foreign plaintiff is suing a United States resident, "the presumption in favor of giving plaintiffs their choice of court is little more than a tie breaker," and "all really that the court is left to weigh is the relative advantages and disadvantages of the alternative forums." *Instituto Mexicano*, 29 F.4th at 357–58 (internal quotations omitted).

The factors the court must consider fall into two broad categories. The first is convenience, or the "practical problems that make trial of a case easy, expeditious and inexpensive." *Am. Dredging Co. v. Miller*, 510 U.S. 443, 448 (1994) (internal quotation marks omitted). The primary question under this category is which forum has better access to witnesses and evidence. *Id.*; *see also Stroitelstvo Bulgaria*, 589 F.3d at 425 (affirming dismissal in part because witnesses and evidence were located in another country); *U.S.O. Corp. v. Mizuho Holding Co.*, 547 F.3d 749, 749–55 (7th Cir. 2008) (same). The second category is the public interest. For the purpose of this case, the primary question under this category is which forum

has a stronger connection to the dispute. *Id.*[5] Both categories of factors clearly favor dismissal in this case.[6]

### 1. Private interest factors

As for convenience, Gaiman identifies numerous potential witnesses who are located in New Zealand, including friends of Pavlovich with whom she discussed her allegations against Gaiman, Gaiman's employees and neighbors who witnessed interactions between the parties, medical and police staff Pavlovich spoke to, and various other third parties who could testify about Pavlovich's whereabouts during the relevant time. Dkt. 22. Gaiman also identifies evidence located in New Zealand, including Pavlovich's medical and bank records, which relate to her damages and allegations of economic insecurity. *Id.* Gaiman says he will not be able to compel depositions or other discovery in New Zealand from the United States.

Pavlovich disputes both the importance of the witnesses and the difficulty that Gaiman will have in presenting a defense from the United States. As for witnesses, Pavlovich says that the only important witnesses are Gaiman, Palmer, and Pavlovich, and that Wisconsin is a more convenient forum than New Zealand for all of them. Pavlovich also says that proceeding with this case against Gaiman in New Zealand would it make it more difficult to coordinate this case with the one against Palmer, which is proceeding in Massachusetts.

---

[5] Public interest factors also include things like the relative congestion of courts in each forum and potential difficulties arising about conflict of laws. *Instituto Mexicano*, 29 F.4th at 360. But the parties do not assert arguments based on those factors, so the court will not consider them.

[6] Gaiman also relies on an "independent contractor agreement" with Pavlovich that requires the parties to bring disputes "relating to" the agreement in New Zealand. Dkt. 22-3. Gaiman does not explain how a lawsuit about sexual assault relates to Pavlovich's status as an independent contractor. In any event, the court need not consider the agreement because dismissal is appropriate under the forum non conveniens doctrine even without the agreement.

These are not persuasive reasons for retaining jurisdiction. Gaiman and Palmer are both objecting to being sued in the United States, and they have agreed to submit to the jurisdiction of New Zealand and testify there.[7] Palmer has not agreed to testify in Wisconsin, and she is likely outside this court's subpoena power. *See* Fed. R. Civ. P. 45(c)(1) (limiting subpoena power to 100 miles of where witness lives, works, or regularly transacts business). So New Zealand is the one place where Pavlovich could seek relief against both defendants in the same venue. This is a significant consideration. Even if both this court and the court in Massachusetts were to retain jurisdiction over both cases, proceeding against both defendants in separate lawsuits would present logistical challenges. Pavlovich's claims against each defendant overlap substantially, raising the potential for inconsistent rulings. For these reasons, the proximity of this district to Gaiman and Palmer's current residences is not a significant factor.

As for Pavlovich's convenience, she says that the United States is closer to where she lives in the United Kingdom than New Zealand is. But both forums are thousands of miles away and in different countries from where Pavlovich resides, so this argument is not persuasive. If Pavlovich's own convenience were a high priority, she could have sued Gaiman in the United Kingdom, where Gaiman is a citizen.

As for the importance of the New Zealand witnesses, Pavlovich says that they are not important because none of them were present when the alleged assaults occurred. But Pavlovich does not allege that she has any physical or other objective evidence to support her claims,

---

[7] Palmer consented to the jurisdiction of New Zealand in her own motion to dismiss on forum non conveniens grounds, which she filed in the suit pending against her in Massachusetts. *See Pavlovich v. Palmer*, No. 25-cv-10263 (D. Mass.), Dkt. 17, at 13 (Palmer "consents to jurisdiction in New Zealand and would agree to testify there.").

11

which means that credibility will be a critical issue. The witnesses Gaiman identifies could either support or undermine Pavlovich's version of events about where she was on particular days and times, what she told others about her interactions with Gaiman at the time, what her financial circumstances were, and whether she was experiencing emotional distress as she says. Any of that testimony could be important to evaluating the parties' credibility.

Pavlovich objects that Gaiman has not identified any specific testimony that a particular witness will provide. But the defendant is "not required to specifically indicate what evidence would be out of reach if litigation proceeded [in the United States] to succeed on a forum non conveniens motion. Instead, [the defendant is] only obligated to provide enough information to enable the District Court to balance the parties' interest." *Instituto Mexicano*, 29 F.4th at 359 (internal quotation marks omitted). Gaiman has met that standard by identifying potential witnesses and categories of evidence that are located in New Zealand and are likely to be relevant to Pavlovich's claims.

As for the difficulty of obtaining testimony from those witnesses, Pavlovich acknowledges that Gaiman would not be able to compel depositions of New Zealand residents through ordinary rules of discovery. Pavlovich also does not dispute that New Zealand residents would be outside this court's subpoena power. But she cites her legal expert's statements that Gaiman could petition the High Court of Zealand to exercise its discretion to compel depositions, Dkt. 38-1, §§ 4.3–4.8, and she says that Gaiman could use those depositions in lieu of in-person testimony at trial. But the question is not whether it would be impossible for the defendant to present a defense in this court; the question is whether New Zealand is a clearly more convenient forum. In this case, all the witnesses and evidence are either located

12

in New Zealand or are subject to New Zealand's jurisdiction. The same cannot be said of this court. So it is clear that, on the whole, New Zealand is more convenient.

### 2. Public interest factors

The public interest factors weigh even more strongly in favor of dismissal: the United States has virtually no connection with the subject matter of the lawsuit. All relevant events occurred in New Zealand, all parties were living in New Zealand during the relevant time, Pavlovich is a New Zealand citizen, and Gaiman was a permanent resident in New Zealand at the time. Pavlovich also identifies no ripple effects that this case could have that would implicate a United States interest, such as "national security in either the strategic or the economic sense of that term," or "compliance with an important U.S. regulatory scheme." *U.S.O.*, 547 F.3d at 755.

Wisconsin jurors would be scratching their heads about how and why they were being asked to decide a dispute regarding such far away events that have nothing to do with them. "Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Am. Dredging*, 510 U.S. at 448 (internal quotation marks omitted). The court of appeals consistently affirms dismissals on forum non conveniens grounds when the United States has only a tenuous connection to the dispute. *See, e.g., Instituto Mexicano*, 29 F.4th at 360–61; *Veljkovic*, 857 F.3d at 756; *Stroitelstvo Bulgaria*, 589 F.3d at 425.

Pavlovich says that the doctrine of forum non conveniens should not apply to a statute like the Trafficking Victims Protection Act (TVPA), which is intended to apply extraterritorially. But this argument has multiple flaws.

As an initial matter, Pavlovich is putting the cart before the horse because the law is unsettled whether the civil remedies provision in the TVPA applies outside the United States.

Courts presume that a federal statute has only domestic application unless Congress has "affirmatively and unmistakenly" stated otherwise in the statute. *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335 (2016).

In this case, the TVPA states that "the courts of the United States have extra-territorial jurisdiction over any offense" identified in certain criminal laws that prohibit trafficking. 18 U.S.C. § 1596. Those same laws can also be enforced through a civil action, 18 U.S.C. § 1595, but the civil remedy provision does *not* say that it has extraterritorial application. That is a potential problem for Pavlovich because the Supreme Court held in *RJR Nabisco v. European Community* that the civil remedies provision in the Racketeer Influenced and Corrupt Organizations Act (RICO) does not apply extraterritorially, even though many of the substantive criminal provisions that provide the basis for a civil action do. 579 U.S. 325 (2016). The Court stated that "the presumption against extraterritoriality must be applied separately to both RICO's substantive prohibitions and its private right of action" because "[t]he creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion" and "providing a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct." *Id.* at 346–47, 350. There is no language in RICO's civil enforcement provision suggesting that it reaches foreign injuries, so the Court limited the provision to domestic conduct. *Id.* at 350.

Neither the Supreme Court nor the Court of Appeals for the Seventh Circuit have considered whether the civil remedy provision in TVPA applies extraterritorially. And there is a split in authority regarding whether it does. *Roe v. Howard* concluded that the civil remedy

provision does apply extraterritorially, reasoning that "§ 1595 directly incorporates predicate offenses that govern foreign conduct, providing strong textual evidence of its extraterritorial effect when applied to those predicates" and that the purpose of the TVPA was to "address the problem of human trafficking throughout the world." 917 F.3d 229, 242–43 (4th Cir. 2019). *Mia v. Kimberly-Clark Corporation* disagreed with *Roe*, observing that it had adopted the same reasoning the Supreme Court rejected in *RJR Nabisco*. No. 22-cv-2353, 2025 WL 752564, at *7 (D.D.C. Mar. 10, 2025).

*Mia* appears to have the better argument. Both RICO and the TVPA include criminal provisions that apply extraterritorially and civil enforcement provisions that incorporate the prohibitions on criminal conduct but do not include their own language regarding extraterritorial application. So the structure of the two statutes appears to be the same, suggesting that *RJR Nabisco* is controlling. The distinction that *Roe* tried to make about the purpose of the TVPA is not persuasive: "The question is not whether we think Congress would have wanted a statute to apply to foreign conduct if it had thought of the situation before the court." *RJR Nabisco*, 579 U.S. at 335. Rather, the text of the statute itself must provide a "clear indication of an extraterritorial application." *Id.* Pavlovich does not identify such a clear indication in the civil remedy provision.

But even if the TVPA civil remedy provision does apply outside the United States, that would not be dispositive. Pavlovich cites no authority from the Supreme Court or the Seventh Circuit suggesting that a statute's extraterritorial application is an important consideration in a forum non conveniens analysis. The court of appeals has considered whether the plaintiff is asking the court to apply domestic or foreign law, *see, e.g., U.S.O.*, 547 F.3d at 755; *Instituto Mexicano*, 29 F.4th at 361, but that is just one factor of many.

For example, in *Instituto Mexicano*, the court acknowledged that "the United States has some interest in malfeasance by its citizens abroad," but it was reasonable for the district court to dismiss the case on forum non conveniens grounds when most of the alleged misconduct took place in Mexico. 29 F.4th at 360–61. *Instituto Mexicano* cited another case in which the court concluded that "Illinois has a strong incentive to punish its citizens for . . . legal wrongs committed abroad," but "it was within the district court's discretion to conclude that the U.K.'s stronger interest in protecting its citizens from legal wrongs committed in England by foreign citizens makes England the more appropriate forum." *Id.* (quoting *Cap. Markets Int'l, Ltd. v. Geldermann*, No. 98-3242, 1999 WL 439405, at *4 (7th Cir. June 21, 1999)). That is essentially the same situation here. The only interest the United States has in this case is that it involves alleged misconduct by a permanent resident of the United States. But Gaiman is also a permanent resident of New Zealand, so that factor does not weigh heavily in favor of retaining jurisdiction. New Zealand has a stronger interest in protecting one of its own citizens from wrongful conduct committed in New Zealand by a New Zealand permanent resident.

The bottom line is that New Zealand has a much stronger interest in this case than the United States does and, on the whole, New Zealand is a more convenient forum than the United States for resolving this dispute. So the court will grant the motion to dismiss on forum non conveniens grounds.

ORDER

IT IS ORDERED that defendant Neil Gaiman's motion to dismiss, Dkt. 18, is GRANTED. The case is DISMISSED without prejudice under the doctrine of forum non conveniens. The clerk of court is directed to enter judgment accordingly and close this case.

Entered October 3, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge