No. 25-2754

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

SCARLETT PAVLOVICH,

        Plaintiff-Appellant,

v.

NEIL GAIMAN,

        Defendant-Appellee.

---

**On Appeal from** the United States District Court
for the Western District of Wisconsin
The Honorable James D. Peterson, Presiding
Case No. 3:25-cv-78-jdp

---

## BRIEF OF DEFENDANT-APPELLEE

---

KRAVIT, HOVEL & KRAWCZYK S.C.

Stephen E. Kravit
State Bar No. 1016306
Brian T. Fahl
State Bar No. 1043244
Wesley E. Haslam
State Bar No. 1121993
825 North Jefferson Street, Suite 500
Milwaukee, Wisconsin 53202
(414) 271-7100 (phone)
(414) 271-8135 (facsimile)
kravit@kravitlaw.com
btf@kravitlaw.com
weh@kravitlaw.com

BERK BRETTLER LLP

Andrew B. Brettler, *pro hac vice*
9119 West Sunset Boulevard
West Hollywood, California 90069
(310) 278-2111
abrettler@berkbrettler.com

## DISCLOSURE STATEMENT

The true name of the party the undersigned attorneys represent is Neil Gaiman, an individual. Neil Gaiman is not a corporation.

The law firms who represent Neil Gaiman, and whose attorneys will appear for Neil Gaiman in this court are Kravit, Hovel & Krawczyk s.c. by attorneys Stephen E. Kravit and Brian T. Fahl, and Berk Brettler LLP by attorney Andrew Brettler.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ................................................................ i

TABLE OF CONTENTS.................................................................... ii

TABLE OF AUTHORITIES ............................................................ iv

JURISDICTIONAL STATEMENT ...................................................... 1

COUNTERSTATEMENT OF ISSUES ................................................ 2

STATEMENT OF THE CASE............................................................ 3

    A. The District Court Did Not Abuse Its Discretion When it Granted Gaiman's Motion to Dismiss The Complaint on *Forum Non Conveniens* Grounds. ... 3

    B. The Appellant's Scandalous Strike Suit Is Without Merit and Should Have Been Brought in New Zealand, if Anywhere at All...................................... 3

SUMMARY OF ARGUMENT ............................................................ 8

ARGUMENT ................................................................................ 10

I.   THE DISTRICT COURT'S *FORUM NON CONVENIENS* DISMISSAL WAS NOT AN ABUSE OF DISCRETION ............................................ 10

    A. The District Court Has Broad Discretion to Dismiss The Complaint Under The Doctrine of *Forum Non Conveniens.*.................................................... 10

    B. New Zealand is an Adequate Forum Because it Provides Appellant With a Fair Hearing to Obtain a Remedy For Her Allegations........................... 11

    C. The District Court Appropriately And Accurately Weighed All Relevant Private And Public Interest Factors. .......................................... 16

        1. The Private Interest Factors Support Dismissal on *Forum Non Conveniens* Grounds................................................................ 17

        2. The Public Interest Factors Support Dismissal on *Forum Non Conveniens* Grounds................................................................ 23

II.  THE TVPA DOES NOT BAR *FORUM NON CONVENIENS* DISMISSAL .. 25

    A. Appellant Waived the Issue That the TVPA Bars the Application of the *Forum Non Conveniens* Doctrine. ........................................... 25

    B. The Appellant's Argument Regarding The Applicability of The *Forum Non Conveniens* Doctrine is Misplaced................................................ 26

III.   THE CIVIL REMEDY PROVISION OF THE TVPA DOES NOT APPLY EXTRATERRITORIALLY ................................................................................ 32

    A.  The Presumption Against Extraterritoriality Must be Applied to § 1595 of The TVPA. ...................................................................................... 33

    B.  Congress Did Not Give a Clear, Affirmative Indication That § 1595 Applies Extraterritorially. ..................................................................... 34

    C.  The Supreme Court's Decision in *RJR Nabisco* Controls. ......................... 38

CONCLUSION .......................................................................................... 44

CERTIFICATE OF COMPLAINCE WITH FRAP RULE 32(A)(7), FRAP RULE 32(G) AND CR 32(C) .......................................................................................... 46

## TABLE OF AUTHORITIES

### Cases

*Adhikari v. KBR Inc.*,
  No. 16-CV-2478, 2017 WL 4237923 (S.D. Tex. Sept. 25, 2017) ............................ 34

*Alcoa S.S. Co. v. M/V Nodic Regent*,
  541 F.2d 307 (2d Cir. 1976).................................................................................... 29

*Aldana v. Del Monte Fresh Produce N.A.*,
  578 F.3d 1283 (11th Cir. 2009) ......................................................................... 31, 32

*Am. Dredging Co. v. Miller*,
  510 U.S. 443 (1994) ........................................................................................... 17, 24

*Bos. Telecomms. Grp. v. Wood*,
  588 F.3d 1201 (9th Cir. 2009) ................................................................................. 24

*Broad. Rights Int'l Corp. v. Societe du Tour de France, S.A.R.L.*,
  708 F. Supp. 83 (S.D.N.Y. 1989) ............................................................................ 11

*Cap. Currency Exch., N.V. v. Nat'l Westminster Bank PLC*,
  155 F.3d 603 (2d Cir. 1998)............................................................................... 28, 29

*Clerides v. Boeing Co.*,
  534 F.3d 623 (7th Cir. 2008) ................................................................................... 16

*Cruz v. Mar. Co. of Phillipines*,
  702 F.2d 47 (2d Cir. 1983)....................................................................................... 28

*de Melo v. Lederle Labs.*,
  801 F.2d 1058 (8th Cir. 1986) ................................................................................. 11

*Doe I v. Apple Inc.*,
  No. 19-CV-03737 (CJN), 2021 WL 5774224 (D.D.C. Nov. 2, 2021) ................. 36, 37

*Doe I v. Apple Inc.*,
  96 F.4th 403 (D.C. Cir. 2024).................................................................................. 36

*Glob. Art Exhibs., Inc. v. Kuhn & Bulow Italia Versicherungsmakler GmbH*,
  607 F. Supp. 3d 421 (S.D.N.Y. 2022) ..................................................................... 16

*GoldenTree Asset Mgmt. LP v. BNP Paribas S.A.*,
  64 F. Supp. 3d 1179 (N.D. Ill. 2014) ...................................................................... 13

*Gulf Oil Corp. v. Gilbert*,
   330 U.S. 501 (1947) ................................................................ 26, 27, 29

*Hale v. Victor Chu*,
   614 F.3d 741 (7th Cir. 2010) .................................................... 26

*Howe v. Goldcorp Invs., Ltd.*,
   946 F.2d 944 (1st Cir. 1991) .................................................... 26, 28

*Huff v. White Motor Corp.*,
   609 F.2d 286 (7th Cir. 1979) .................................................... 14

*In re Aircrash Disaster Near New Orleans*,
   821 F.2d 1147 (5th Cir. 1987) .................................................. 28

*In re Am. Med. Sys., Inc. Pelvic Repair Sys. Prods. Liab. Litig.*,
   No. 13-CV-19418, 2014 WL 637189 (S.D.W. Va. Feb. 18, 2014) .......... 12

*In re Factor VIII or IX Concentrate Blood Prods. Liab. Litig.*,
   408 F. Supp. 2d 569 (N.D. Ill. 2006) ........................................ 15

*In re Factor VIII or IX Concentrate Blood Prods. Litig.*,
   484 F.3d 951 (7th Cir. 2007) .................................................... 15

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
   887 F. Supp. 1469 (N.D. Ala. 1995) .......................................... 12, 13

*Inst Mex. del Seguro Soc. v. Zimmer Biomet Holdings, Inc.*,
   29 F.4th 351 (7th Cir. 2022) .................................................... 11, 16, 17

*Kamel v. Hill-Rom Co.*,
   108 F.3d 799 (7th Cir. 1997) .................................................... 15

*Kellog Brown & Root Servs., Inc. v. United States ex rel. Carter*,
   575 U.S. 650 (2015) ................................................................ 37

*Lockman Found. v. Evangelical All. Mission*,
   930 F.2d 764 (9th Cir. 2022) .................................................... 11

*Lueck v. Sundstrand Corp.*,
   236 F.3d 1137 (9th Cir. 2001) .................................................. 12

*Mia v. Kimberly-Clark Corp.*,
   No. 22-cv-2353, 2025 WL 752564 (D.D.C. Mar. 10, 2025) ................ 42

*Moulton v. Vigo Cnty.*,
   150 F.3d 801 (7th Cir.1998) .................................................... 26

*Mujica v. Occidental Petrol. Corp.*,
  381 F. Supp. 2d 1134 (C.D. Cal. 2005) ............................................................ 31, 32

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981) ...................................................................... 11, 14, 16

*RJR Nabisco v. Eur. Cmty.*,
  579 U.S. 325 (2016) ............................................................................ passim

*Robyns v. Reliance Standard Life Ins. Co.*,
  130 F.3d 1231 (7th Cir. 1997) ...................................................................... 26

*Roe v. Howard*,
  917 F.3d 229 (4th Cir. 2019) ................................................................ 34, 38, 39, 42

*Stevens v. Umsted*,
  131 F.3d 697 (7th Cir.1997) ...................................................................... 26

*Stonnell v. Int'l Harvester Co.*,
  132 Ill. App. 3d 1043, 478 N.E.2d 518 (1985).......................................................... 12

*Stroitelstvo Bulg. Ltd. v. Bulgarian-Am. Enter. Fund*,
  589 F.3d 417 (7th Cir. 2009) ..................................................................... 8, 13, 17

*Transunion Corp. v. Pepsico, Inc.*,
  811 F.2d 127 (2d Cir. 1987)........................................................................ 28

*U.S.O. Corp. v. Mizuh Holding Co.*,
  547 F.3d 749 (7th Cir. 2008) ...................................................................... 17

*United States ex rel. Hawkins v. ManTech Int'l Corp.*,
  752 F. Supp. 3d 118 (D.D.C. 2024) .............................................................. 36, 37, 38

*United States v. Nat'l City Lines*,
  334 U.S. 573 (1948) .......................................................................... 25, 26, 27, 28

*Wiwa v. Royal Dutch Petrol. Co.*,
  226 F.3d 88 (2d Cir. 2000).................................................................... 30, 31, 32

## Statutes

8 U.S.C. § 1101......................................................................................... 35

18 U.S.C. §§ 1589, 1590(a), 1591, and 1594............................................................. 8

18 U.S.C. § 1595................................................................................... passim

18 U.S.C.§ 1596 ............................................................................. passim

18 U.S.C. § 1783 ...................................................................................... 21

18 U.S.C. § 1962 ............................................................... 39, 40, 41, 43

18 U.S.C. § 1964 ...................................................................................... 41

18 U.S.C. § 1964(c) ......................................................................... passim

28 U.S.C. §§ 1331 or 1332 .................................................................. 27

28 U.S.C. § 1404(a) ............................................................................... 27

46 U.S.C. § 30104 .............................................................. 9, 28, 29, 32

Torture Victim Protection Act of 1991,
    Pub. L. No. 102-256, § 2(a), 106 Stat. 73 ......................... 29, 30, 31, 32

Victims of Trafficking and Violence Protection Act of 2000,
    Pub. L. No. 106-386, 114 Stat. 1464 (2000) ............................... 35

## Rules

Circuit Rule 32(c) .................................................................................. 46

Fed. R. Civ. P. 12(b)(6) ........................................................................ 3

Fed. R. Civ. P. 32(a)(7) ................................................................. iii, 46

Fed. R. Civ. P. 32(g) ...................................................................... iii, 46

Fed. R. Civ. P. 45(b)(3) ...................................................................... 21

## Other Authorities

1A Fed. Proc., L. Ed. § 1:827 ........................................................... 11

DAMAGES, Black's Law Dictionary (12th ed. 2024) ......................... 43

Lonny Sheinkopf Hoffman & Keith A. Rowley, *Forum Non Conveniens in
    Federal Statutory Cases,*
    49 Emory L.J. 1137 (2000) ........................................................... 29

## JURISDICTIONAL STATEMENT

Defendant-Appellee asserts that the Plaintiff-Appellant's jurisdictional statement is complete and correct.

# COUNTERSTATEMENT OF ISSUES

*First Question Presented:*

Whether the district court, after determining that New Zealand provided an available and adequate remedy and weighed all relevant public and private interest factors, abused its discretion when it dismissed Plaintiff-Appellant's claims on *forum non conveniens* grounds.

*Second Question Presented:*

Whether the federal courts have the power to dismiss claims under the Trafficking Victims Protection Act (the "TVPA") on *forum non conveniens* grounds, or whether this statute precludes a federal court's power based on seventy-eight-year-old case law that has only been used to address statutes legislated before the advent of the *forum non conveniens* doctrine.

*Third Question Presented:*

Whether the civil remedies provision of the TVPA, 18 U.S.C. § 1595, contains the clear and affirmative language necessary to overcome the presumption against extraterritoriality.

## STATEMENT OF THE CASE

### A. The District Court Did Not Abuse Its Discretion When it Granted Gaiman's Motion to Dismiss The Complaint on *Forum Non Conveniens* Grounds.

Plaintiff-Appellant Scarlett Pavlovich, a.k.a. Scarlet Wynter, a.k.a. Molly Pavlovich ("Appellant" or "Pavlovich") filed claims against Defendant-Appellee Neil Gaiman ("Appellee" or "Gaiman") alleging violations of the Trafficking Victims Protection Act ("TVPA"), civil conspiracy, conspiracy to commit trafficking, assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress, in the Western District of Wisconsin in case number 3:25-cv-00078-jdp. The allegations in Appellant's Complaint supposedly occurred entirely within the jurisdiction of New Zealand. R.2. Gaiman moved to dismiss on grounds of *forum non conveniens*, and under Rule 12(b)(6)—failure to state a claim for which relief may be granted, because the civil remedies provision of the TVPA, 18 U.S.C. § 1595, do not meet the criteria for extraterritorial jurisdiction. R.18.

The district court granted Gaiman's motion to dismiss based on *forum non conveniens* grounds but did not rule on the issue of whether the TVPA's civil provision meets the criteria for extraterritorial jurisdiction. R.51; Appellant Appx. Tab 1. There were no motions for reconsideration or other motions in the district court. Appellant filed an appeal of the district court's decision with this Court on December 1, 2025.

### B. The Appellant's Scandalous Strike Suit Is Without Merit and Should Have Been Brought in New Zealand, if Anywhere at All.

Appellant is a citizen of New Zealand. R.36 at 18. At all times relevant to the allegations in the Complaint, Gaiman was a citizen of the United Kingdom, a

permanent resident of New Zealand, and a permanent resident of the United States. R.23 ¶¶ 2-4. Appellant worked as a babysitter for Gaiman and Gaiman's estranged wife, Amanda Palmer' s son. On February 3, 2025, Appellant filed a salacious Complaint in the Western District of Wisconsin seeking over $7,000,000 in damages and alleging that Gaiman sexually assaulted her in New Zealand. R.2. Gaiman disputed and denied all material allegations asserted against him. R.19.

All of the alleged facts set forth in the Complaint supposedly took place entirely within the country of New Zealand. Appellant, an adult and former friend of Gaiman's former spouse, Amanda Palmer, who had previously house-sat for Palmer in New Zealand, began babysitting Gaiman and Palmer's son in early 2022. Appellant and Gaiman began a brief personal relationship, which involved consensual physical intimacy, albeit not sexual intercourse. Gaiman did not engage in the outrageous conduct Appellant accused him of in her Complaint. Those accusations were thoroughly investigated by New Zealand authorities, who declined to file any charges against Gaiman and found no credible evidence of wrongdoing.

Gaiman first met Appellant in New Zealand in early February of 2022 when Palmer hired Appellant to babysit her and Gaiman's son. R.23 ¶ 5. On February 4, 2022, Appellant and Gaiman shared a meal together in the garden outside of Gaiman's home on Waiheke Island, New Zealand. *Id.* ¶ 6. Gaiman's then-wife, Amanda Palmer, had informed Gaiman that Pavlovich told her she wanted to engage in a sexual relationship with Gaiman. In the garden, there was an outdoor bathtub. *Id.* ¶ 7. Gaiman invited Appellant to bathe with him in the bathtub, and Appellant

4

accepted. *Id.* Gaiman and Appellant discussed consent at great length. *Id.* During this conversation, Appellant told Gaiman that she preferred older partners and was interested in a sexual relationship with Gaiman. *Id.* After this conversation about consent, Gaiman and Appellant removed their clothes and got into the bath. *Id.* Gaiman and Appellant "made out" in the bath and then returned to the house and engaged in further sexual activity. *Id.* Gaiman and Appellant did ***not*** engage in sexual intercourse. *Id.* During these activities, Appellant did not say or do anything that would indicate her participation in these activities was not willing and consensual. *Id.*

Gaiman presented contemporaneous written correspondence (WhatsApp messages) between Appellant and himself that tells a very different story than the allegations in the Complaint. This correspondence reflects that all of Gaiman's conduct with Appellant was consensual, and that it was initiated and encouraged by Appellant. This correspondence further identified individuals who are citizens and/or residents of New Zealand who would be key witnesses in this case.

Appellant sent Gaiman a message the day after their first encounter that further evidenced the fact that the prior night had been a consensual encounter: *"Thank you for a lovely night ~ wow x"*:



R.23-1 at 3. Over the following two days, Appellant sent messages to Gaiman asking him to bathe with her again: "Do you feel like a rain bath :) . . . Let me know if you want me to run a bath. I am consumed by thoughts of you . . . I hope tomorrow, or some other time soon [heart on fire emoji]":



*Id.* at 3.

On February 9, 2022, just five days after their initial encounter, Appellant sent Gaiman a message asking if she could spend the night with him at his home: *"If you happen to be alone later tomorrow night and are struck by an adventurous impetus, maybe I could come for a visit and then vanish in the morning for work like an apparition . . . I'm at your service. You've made me a bit of a greedy girl:)"*:

*Id.* at 4. Gaiman declined her offer to spend the night.

Over a month later, Gaiman confronted Appellant about rumors he heard from Palmer regarding Appellant's purported allegations of sexual assault. In response to a friendly reach out from Appellant, on March 24, 2022, Gaiman texted Appellant to express his shock and disbelief over these rumors. Within minutes, Appellant replied,

*"Oh my God, Neil! I never said that . . . Rape? WHAT? This is the first I have heard of this. Wow. I need a moment to digest your message."*:

> Honestly, when Amanda told me that you were telling people I'd raped you and were planning to Me Too me, I wanted to kill myself. But I'm getting through it a day at a time, and it's been two weeks now and I'm still here. Fragile but not great. 11:20
>
> Oh my God. Neil! I never said that. I have been deeply upset about it all because it has triggered things from my past and also for many reasons I feel whiplash. But I'm horrified by your message - me too you? Rape? WHAT? This is the first I have heard of this. Wow. I need a moment to digest your message. 11:25

*Id.* at 13.

Two days later, on March 26, 2022, Appellant again wrote that the sexual assault claim was *"absolutely not true"* and that the intimate contact she had with Gaiman was *"consensual (and wonderful)!"* She expressed her frustration and anger towards the person or persons she blamed for the rumors getting *"out of control."* Appellant emphatically concluded, *"It was consensual—how many times do I have to fucking tell everyone."*:

> I am so angry I have no words. Not at you. Neil, I'm so sorry. Fuck going to Waiheke. I'm livid with everyone. This is beyond out of control and as I said I only have fondness and kindness for you. It was consensual - how many times do I have to fucking tell everyone.
>
> I hug you. Are you okay? I've been so wrapped up in me I haven't asked you. 12:5_
>
> Post Covid was hard. (I have a theory btw that you and I had Delta not Omicron, which is why it was so hard. Because I had the complete loss of taste and smell and that's not an omicron thing.) 13:01
>
> And I have only fondness and kindness for you. 13:04
>
> Thank you for being a good person. 13:56

*Id.* at 16.

Much later, and despite asking Gaiman for money to pay for her apartment, Appellant apparently reported this alleged activity to law enforcement authorities in New Zealand. R.23 ¶ 13. Her allegations against Gaiman were thoroughly investigated by New Zealand police, and based on her own statements in the above

quoted messages, no charges were brought. *Id.* In early April of 2024, the New Zealand police closed the investigation. *Id.*

After the investigation was closed, Appellant began a public relations campaign against Gaiman, describing her allegations against him in lurid detail on a multi-part podcast. R.23 ¶ 14. She then filed a 365-paragraph Complaint against both Gaiman and Palmer, alleging assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and violations of 18 U.S.C. §§ 1589, 1590(a), 1591, and 1594.[1] The lengthy and salacious Complaint describes conduct that allegedly occurred entirely within the country of New Zealand.

## SUMMARY OF ARGUMENT

As to the first issue, the district court did not abuse its discretion when it correctly ruled that New Zealand was a more convenient forum than the United States for resolving this dispute. This Court should affirm the district court's decision because (1) the remedies available in New Zealand are available and adequate, and (2) because the district court considered all relevant public and private interest factors.

New Zealand is an available and adequate forum because Gaiman and Palmer both consent to accept service in New Zealand and because it provides Appellant with a "fair hearing to obtain some remedy for the alleged wrong." *Stroitelstvo Bulg. Ltd. v. Bulgarian-Am. Enter. Fund*, 589 F.3d 417, 421 (7th Cir. 2009). The remedies

---

[1] Pavlovich filed an almost identical suit against Palmer in the District of Massachusetts, *Pavlovich v. Palmer*, No. 25-CV-10263F (D. Mass. filed Feb. 3, 2025). Palmer has a similar motion to dismiss on *forum non conveniens* grounds in her case. However, as of the date of this brief, the District of Massachusetts has not yet decided Palmer's motion to dismiss.

available in a New Zealand forum include New Zealand's Accident Compensation Act, rehabilitative entitlements, and exemplary or punitive damages.

As to the second issue, federal courts have the power to dismiss a claim based on the TVPA on *forum non conveniens* grounds. While there does appear to be a circuit split on whether certain statutes, e.g., Federal Employers' Liability Act ("FELA") and the Jones Act, may be dismissed on *forum non conveniens* grounds, no court has ever held that claims under the TVPA may not be dismissed on such grounds. Indeed, a ruling to the contrary would make no practical sense. According to Appellant, any allegation of sexual misconduct, that allegedly occurred anywhere in the world, by anyone—regardless of his or her citizenship and/or other ties to the United States— would be entitled to bring a TVPA claim in the U.S. courts at any time. That cannot be, and is not, the law. Appellate courts have upheld *forum non conveniens* dismissals based on statutes far more similar to the TVPA than FELA or other statutes. This Circuit has never held that any statute deprives a federal court of the power to dismiss a case on *forum non conveniens* grounds.

As to the third issue, courts are divided as to whether the civil remedies provision of the TVPA, 18 U.S.C. § 1595, overcomes the presumption against extraterritoriality. This Court does not need to address this issue because the district court did not rule on it, nor did it rely on it. The district court did, however, address this issue and reasoned that Gaiman had the better argument. Ultimately, the court indicated that the extraterritoriality issue would not affect the *forum non conveniens* dismissal it found.

9

To overcome the presumption against extraterritoriality, a statute must give "a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 337 (2016). The TVPA contains a separate provision, § 1596, that grants extraterritoriality to specific TVPA provisions, but the civil remedies provision is <u>not</u> included in this list. This controlling Supreme Court precedent distinguishes between substantive provisions and civil remedies and holds that a statute must provide a clear indication that Congress intended to create a private right of action for ***injuries*** suffered outside the United States. *Id.* The TVPA's civil remedies provision lacks such a clear indication.

## ARGUMENT

## I. THE DISTRICT COURT'S *FORUM NON CONVENIENS* DISMISSAL WAS NOT AN ABUSE OF DISCRETION

Appellant attacks the district court's *forum non conveniens* dismissal by arguing (1) that New Zealand is not an adequate forum; and (2) that the lower court erred in balancing the public and private interest factors. Overturning the district court's decision requires a finding of an abuse of discretion. The district court's dismissal must be upheld because it is well-established that the remedies provided in New Zealand are adequate under a *forum non conveniens* analysis, and because the trial court properly weighed all relevant private and public interest factors.

### A. The District Court Has Broad Discretion to Dismiss The Complaint Under The Doctrine of *Forum Non Conveniens.*

The district court did not abuse its discretion when it dismissed Appellant's claims under the doctrine of *forum non conveniens.* "The *forum non conveniens*

10

determination is committed to the sound discretion of the trial court." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981). A *forum non conveniens* dismissal "may be reversed only when there has been a clear abuse of discretion; where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." *Id.*

## B. New Zealand is an Adequate Forum Because it Provides Appellant With a Fair Hearing to Obtain a Remedy For Her Allegations.

The Supreme Court and the Seventh Circuit have held that an "alternative forum is inadequate only where 'the remedy provided' is 'so clearly inadequate or unsatisfactory that it is no remedy at all.'" *Inst. Mex. del Seguro Soc. v. Zimmer Biomet Holdings, Inc.*, 29 F.4th 351, 358 (7th Cir. 2022) (quoting *Piper Aircraft,* 454 U.S. at 254). The treatise on Federal Procedure contains a long list of situations that are considered adequate:

> Federal Procedure expounds further: The lack of any right to a jury trial in the foreign forum does not render the alternative forum an inadequate one. Delays in an alternative forum's judicial system are not sufficiently harmful of due process to prevent dismissal on forum *non conveniens* grounds. Differences in the available relief also make no difference. Thus, the prospect of a lesser recovery does not justify refusing to dismiss an action on the ground of *forum non conveniens*, provided that the essential subject matter of the dispute can be adequately addressed by the foreign court. Even where relief is not as comprehensive or as favorable as a plaintiff might obtain in an American court, the alternative forum may still be adequate.

§ 1:827. 1A Fed. Proc., L. Ed. § 1:827.[2]

---

[2]Citing *Inst. Mex.*, 29 F.4th 351; *Lockman Found. v. Evangelical All. Mission*, 930 F.2d 764 (9th Cir. 2022); *Broad. Rights Int'l Corp. v. Societe du Tour de France, S.A.R.L.*, 708 F. Supp. 83 (S.D.N.Y. 1989); *de Melo v. Lederle Labs.*, 801 F.2d 1058 (8th Cir. 1986).

Despite the well-established case law governing what constitutes an adequate forum, Appellant still argues that New Zealand's scheme for compensatory relief is "no remedy at all." Appellant's Brief at 37. New Zealand offers compensatory relief through its Accident Compensation Act, legislation the New Zealand legislature enacted to provide compensatory damages for victims of torts. New Zealand's Accident Compensation Act has been the subject of a number of federal cases in which the courts have uniformly held that the Act provides an adequate remedy for the purposes of a *forum non conveniens* dismissal. *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1144 (9th Cir. 2001); *In re Am. Med. Sys., Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, No. 13-CV-19418, 2014 WL 637189, at *3 (S.D.W. Va. Feb. 18, 2014); *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 887 F. Supp. 1469, 1475 (N.D. Ala. 1995); *Stonnell v. Int'l Harvester Co.*, 132 Ill. App. 3d 1043, 1044, 478 N.E.2d 518, 519 (1985).

Appellant argues that her case is distinguishable from the trove of cases that established New Zealand's Accident Compensation Act is an adequate remedy. She claims that she does not have access to New Zealand's compensation scheme because she now lives in the United Kingdom. Setting aside the obvious question of why then she did not bring this claim in the United Kingdom (where she also is a resident and Gaiman is a citizen), this argument is flawed because (1) she left New Zealand on her own accord and is not prohibited from returning to New Zealand where compensation is still available to her; and (2) New Zealand offers other remedies such as punitive or exemplary damages.

Appellant fails to cite any authority to support the argument that her choice to live abroad would make an alternative forum's remedy inadequate. *Id*. at 37-38. Appellant argues that she "had no obligation to remain indefinitely in the country where she was assaulted." *Id*. This argument is unconvincing, as "the test is whether the forum provides some potential avenue for redress for the subject matter of the dispute." *GoldenTree Asset Mgmt. LP v. BNP Paribas S.A.*, 64 F. Supp. 3d 1179, 1192 (N.D. Ill. 2014) (citing *Stroitelstvo Bulg. Ltd.*, 589 F.3d at 421). "A forum is inadequate only if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Id*. Appellant may not want to return to New Zealand, but this is her choice—she is not prohibited from doing so. As such, the district court did not abuse its discretion when it held that the remedies available to the Appellant were adequate.

While only addressed in a lengthy footnote in her appellate brief, Appellant argues that her situation is akin to some of the plaintiffs in *Silicone Gel*. Appellant's Brief at 38. The present case is very distinguishable, however, because in *Silicone Gel*, the New Zealand plaintiffs were barred from receiving any benefits through the Accident Compensation Act due to a statutory provision precluding any claims for compensation for injuries between 1974 and 1992. *Silicone Gel*, 887 F. Supp. at 1475. The *Silicone Gel* plaintiffs were thus completely precluded from receiving a remedy. *Id*. That provision of the Accident Compensation Act does not apply to Appellant and, as she concedes, the only reason she does not receive compensation under the Act is

because she chooses to live abroad. The remedy is still available for her, and, as courts have consistently held, that remedy is adequate.

Not only does Appellant have a remedy through New Zealand's Accident Compensation Act, but she also has other remedies available through New Zealand's judicial process. Appellant may also obtain relief through a suit for exemplary and/or punitive damages—available remedies her own "New Zealand law expert" acknowledged. R.38-1 at 9. Appellant then argues that punitive damages are not adequate because they "do not exist to compensate or make whole the plaintiff." Appellant's Brief at 38. She cites no cases for the proposition that punitive damages are not an adequate remedy in the context of *forum non conveniens* analysis. While many cases exist that jurisdictions without punitive damages may still provide an adequate remedy, there are no known cases that support Appellant's argument that punitive damages are not adequate remedies. Appellant cites to a 1979 case unrelated to *forum non conveniens* that states: "Punitive damages are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Id.* at 39 (quoting *Huff v. White Motor Corp.*, 609 F.2d 286, 297 (7th Cir. 1979) (internal quotations omitted). What is and is not an adequate remedy does not hinge on the definition nor purpose of the available remedy. It hinges on whether a plaintiff "**will be deprived of any remedy**." *Piper*, 454 U.S. at 254 (emphasis added).

Appellant does not address the district court's finding that she actually did receive a remedy through New Zealand's Accident Compensation Act. As the district court

pointed out, Appellant was receiving treatment through New Zealand's compensation scheme until July of 2024. The only reason the treatment was discontinued, according to a letter Appellant submitted to her response brief, was because she decided to leave New Zealand. Appellant argues that "past treatment is not an adequate remedy for her ongoing mental health injuries," Appellant's Brief at 37, but she cites no authority in support. Courts in this Circuit has consistently held that a "court may dismiss on *forum non conveniens* grounds" so long as the forum provides "some potential avenue for redress." *In re Factor VIII or IX Concentrate Blood Prods. Liab. Litig.*, 408 F. Supp. 2d 569, 576 (N.D. Ill. 2006), *aff'd sub nom. In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 484 F.3d 951 (7th Cir. 2007) (quoting *Kamel v. Hill-Rom Co.*, 108 F.3d 799, 803 (7th Cir. 1997)). The district court did not abuse its discretion when it considered that Appellant has the option to obtain a remedy in New Zealand and that she had already utilized that remedy.

Finally, Appellant contends that New Zealand's remedies are unavailable to her because she may be subject to an order requiring her to post a security for Gaiman's costs of defense if he successfully defends the suit in New Zealand. Again, Appellant cites no authority to indicate that such a security would preclude a *forum non conveniens* dismissal. Further, her own expert stated that such a fee would be at the discretion of the New Zealand High Court. R.38-1 at 17 ("The High Court has a discretion to require a plaintiff who is resident out of New Zealand to give security for anticipated costs as a condition of proceeding with the claim."). Courts have already addressed such arguments and found that requiring a security to file a

lawsuit does not make a forum inadequate. *Glob. Art Exhibs., Inc. v. Kuhn & Bulow Italia Versicherungsmakler GmbH*, 607 F. Supp. 3d 421, 437 (S.D.N.Y. 2022).  To find that a foreign forum is inadequate, the remedies must be so inadequate as to be no remedy at all. *Id.* at 437. "Features such as the . . . requirement that plaintiffs post security for litigation costs and that the losing party in a lawsuit pays the attorney's fees for the prevailing party do not meet that standard." *Id.* (internal quotations omitted).

### C. The District Court Appropriately And Accurately Weighed All Relevant Private And Public Interest Factors.

When a foreign forum is available and adequate, courts must then balance the public and private interest factors in determining whether to dismiss on *forum non conveniens* grounds. Where, unlike here, a plaintiff is suing in her home forum, "the plaintiff's choice of forum should be disturbed only if the balance of public and private interest factors strongly favors the defendant." *Clerides v. Boeing Co.*, 534 F.3d 623, 628 (7th Cir. 2008). However, where, as here, a foreign plaintiff is suing a United States resident, "the presumption in favor of giving plaintiffs their choice of courts is little more than a tie breaker," and "all really that the court is left to weigh is the relative advantages and disadvantages of the alternative forums." *Inst. Mex.*, 29 F.4th at 357-58 (internal quotations omitted). "Where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." *Piper*, 454 U.S. at 257. Here, the private and public interest factors all strongly weigh in favor of a New Zealand forum because: (1) the overwhelming majority of witnesses and evidence are

located within New Zealand; (2) New Zealand does not have a compulsory process to obtain discovery; (3) New Zealand has a much stronger interest in this case than the United States, which essentially has no interest in the dispute whatsoever.

### 1. The Private Interest Factors Support Dismissal on *Forum Non Conveniens* Grounds.

"Courts look to four private interest factors when evaluating the viability of an alternative forum." *Inst. Mex.*, 29 F.4th at 359. These factors include the "(1) relative ease of access to sources of proof; (2) availability of compulsory process and costs for attendance of witnesses; (3) possibility of viewing the premises, if appropriate; and (4) other practical issues including the ease of enforcement of any ultimate judgment." *Id.* (internal quotations omitted). In its opinion, the district court described the private interest factors as "practical problems that make trial of a case easy, expeditious and inexpensive." R. 51:9; Appellant Appx. Tab 1, p. 9 (citing *Am. Dredging Co. v. Miller*, 510 U.S. 443, 448 (1994). The district court further opined that the "primary question under this category is which forum has better access to witnesses and evidence. *Id.* (citing *Stroitelstvo Bulg.*, 589 F.3d at 425 (affirming dismissal in part because witnesses and evidence were located in another country); *U.S.O. Corp. v. Mizuh Holding Co.*, 547 F.3d 749, 749-55 (7th Cir. 2008)).

Here, the overwhelming majority of witnesses and evidence identified in the Complaint and Gaiman's declaration are located in New Zealand. In support of this assertion, Gaiman submitted a declaration which included numerous text messages where Appellant discusses telling potential witnesses that her relationship with Gaiman was consensual:

17

> I am so angry I have no words. Not at you. Neil, I'm so sorry. Fuck going to Waiheke. I'm livid with everyone. This is beyond out of control and as I said I only have fondness and kindness for you. It was consensual - how many times do I have to fucking tell everyone.        12:53

R.23-1 at 16. Such witnesses would be critical to defending Appellant's claims.

Appellant's own Complaint identifies a slew of witnesses who reside in New Zealand and alleges conduct that was observed or discussed by witnesses residing in New Zealand or elsewhere outside of the United States. The Complaint includes allegations of conduct on the island of Waiheke, which is accessible only "via a forty-minute ferry ride"; that Gaiman left his child at a friend's house while the first alleged assault transpired; that Appellant was vulnerable because, although she worked at a perfume store and lived in an apartment in Auckland, Appellant argues she had no other jobs or residence; that she filed a police report and that "the police took no action because Palmer refused to talk to them"; and a number of other allegations that could only be refuted or confirmed through the testimony of witnesses. R.2 ¶¶ 53-105, 20-215, 252. A proper defense of Appellant's allegations would require discovery from several individuals located on the island of Waiheke.

The Complaint demands relief "believed to be in excess of $1,000,000.00" for each of seven separate causes of action. *Id.* ¶¶ 287, 295, 305, 312, 317, 346, 364. These causes of action allege emotional and psychological damage, physical impairment damage and PTSD, anxiety, depression, physical impairments of the brain, and loss of career opportunities. *Id.* The Complaint further alleges Appellant "was put in a psychiatric respite center to treat her suicidal ideation." *Id.* ¶ 234. Defending the

18

Appellant's allegations and the massive damages she seeks from Gaiman would require not only obtaining records and evidence located within New Zealand but would also include obtaining testimony from witnesses such as treating physicians, potential employers, and others—all located solely within the jurisdiction of New Zealand.

The chart below details potential witnesses identified either in the Complaint or in Mr. Gaiman's declaration:

| EVIDENCE/ WITNESSES | CITATION | LOCATION OF WITNESS | ANTICIPATED TESTIMONY |
|---|---|---|---|
| Guests at Amanda Palmer's home on Waiheke Island | R.2 ¶ 24 | Waiheke Island, New Zealand | Observed interactions between parties |
| Individuals familiar with Appellant | *Id.* ¶¶ 30, 31, 33, 34, 35 | New Zealand | Appellant's claims of economic insecurity, mental disorders, and character witnesses |
| Ferry company employees and records | *Id.* ¶¶ 26, 27, 41, 42 | Waiheke Island and Auckland, New Zealand | Verify presence of parties on Waiheke at specific dates/times |
| Individuals who watched Gaiman's child | *Id.* ¶¶ 49, 53 | Waiheke Island, New Zealand | Dispute facts about Appellant's allegations of assault |
| Hotel employees and records | *Id.* ¶ 159 | Auckland, New Zealand | Dispute Appellant's claims of hotel assault |
| Appellant's bank records | *Id.* ¶¶ 29, 113, 182, 204, 240, 245 | New Zealand | Dispute claims Appellant was not paid for babysitting services |
| Appellant's friends | *Id.* ¶ 238 | New Zealand | Dispute assault claims |
| Police department employees and records | *Id.* ¶¶ 248, 253 | New Zealand | Dispute claims of assault |
| Medical records and treatment professionals | *Id.* ¶¶ 234, 255 | New Zealand | Dispute damages claim |

| EVIDENCE/ WITNESSES | CITATION | LOCATION OF WITNESS | ANTICIPATED TESTIMONY |
|---|---|---|---|
| M.A. | R.23 ¶ 10(a) | New Zealand | Friend of Appellant who perpetuated the false claims |
| R.C. | *Id.* ¶ 10(b) | New Zealand | Gaiman's assistant during the relevant time period, who has information about Appellant's false allegations |
| H.H. | *Id.* ¶ 10(c) | Waiheke Island, New Zealand | Neighbor on Waiheke who can dispute Appellants false claims |
| E.A. | *Id.* ¶ 10(d) | Waiheke Island, New Zealand | Neighbor on Waiheke who can dispute Appellant's false claims |
| S.E.B. | *Id.* ¶ 10(e) | New Zealand | Realtor who can testify about the property referenced in the complaint |
| X.O. | *Id.* ¶ 10(f) | Melbourne, Australia | Personal assistant who can dispute Appellant's false claims |
| E.B. | *Id.* ¶ 10(g) | New Zealand | Personal assistant who can dispute Appellant's false claims |
| V.S. | *Id.* ¶ 10(h) | New Zealand | Son's nanny during the relevant time who can dispute Appellant's false claims |
| L.B. | *Id.* ¶ 10(i) | New Zealand | Housekeeper who can dispute Appellant's false claims |

| EVIDENCE/ WITNESSES | CITATION | LOCATION OF WITNESS | ANTICIPATED TESTIMONY |
|---|---|---|---|
| D.C. | *Id.* ¶ 10(j) | New Zealand | Friend of Appellant whose mother was Appellant's landlord and can dispute Appellant's false claims |
| K. | *Id.* ¶ 10(k) | New Zealand | M.A. partner, who allegedly spoke with Appellant and M.A. about Gaiman |
| P.B.G. | *Id.* ¶10(l) | New Zealand | M.A. friend and purported expert, who allegedly spoke with Appellant and M.A. about Gaiman |
| E.S. | *Id.* ¶ 10(m) | New Zealand | M.A. friend, who allegedly spoke with Appellant and M.A. about Gaiman |

Obtaining testimony from New Zealand witnesses is not only inconvenient because of the geographic distance, over 8,200 miles from the Western District of Wisconsin, but would also be constrained due to the lack of a compulsory process to obtain discovery from such witnesses. Because most of the material witnesses reside in New Zealand and, presumably, are foreign nationals, subpoena power under the Federal Rules of Civil Procedure will not apply. *See* Fed. R. Civ. P. 45(b)(3) and 18 U.S.C. § 1783 (granting extraterritorial subpoena power only for **nationals and residents** of the United States). Nor is New Zealand a party to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters.[3]

---

[3] *See* list of signatories: https://www.hcch.net/en/instruments/conventions/status-table/?cid=82 (last visited December 11, 2025).

Appellant's own expert acknowledged that New Zealand does not allow general discovery. R.38-1 at 2. Their expert further acknowledged that Gaiman would have to petition New Zealand's High Court to obtain compulsory depositions and production of documents from New Zealand witnesses. *Id.* The U.S. State Department's website notes that compulsory depositions are not permitted in New Zealand: "Voluntary depositions may be conducted in New Zealand regardless of the nationality of the witness, provided no compulsion is used."[4]

Appellant erroneously argued that proceeding in New Zealand . . . would not increase Gaiman's access to witnesses at all because Gaiman would have access to those same witnesses in the Western District of Wisconsin. Appellant's Brief at 31. She bases this argument on testimony from her "New Zealand law expert," who stated that Gaiman could petition the High Court of New Zealand for an order compelling deposition testimony and that the High Court ***usually*** grants such requests. *Id.* at 12; R.38-1 at 2. A defendant facing such heinous accusations as those Appellant lobbed against Gaiman deserves more than just good odds that he will have access to witness testimony. Witness testimony will be essential to Gaiman's case.

Appellant falsely characterizes the list of potential witnesses Gaiman identified as "his friends and employees" in an effort to argue that the availability of compulsory discovery is an irrelevant factor. Appellant's Brief at 31. This is a gross mischaracterization of Gaiman's argument. Gaiman identified a slew of potential witnesses, many of whom he identified only through the allegations contained in

---

[4] https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/NewZealand0.html (last visited February 18, 2025).

Appellant's Complaint. The district court correctly found that "Appellant does not allege that she has any physical or other objective evidence to support her claims, which means that credibility will be a critical issue." R. 51:11-12; Appellant Appx. Tab 1, p. 11-12. These witnesses will include a number of individuals who can provide testimony related to Appellant's credibility, including witnesses who can testify to Appellant's location at specific dates and times, witnesses who can testify whether Appellant was experiencing the emotional distress she claims, and witnesses whom Appellant directly told about her interactions with Gaiman.

The district court did not abuse its discretion when it held that the private interest factors favored a New Zealand forum. The court considered all relevant considerations and weighed the difficulty Gaiman would face defending his case 8,200 miles from where the allegations occurred and where the vast majority of the witnesses are located. The court further considered the lack of compulsory discovery in New Zealand and accurately noted that "the question is not whether it would be impossible for the defendant to present a defense in this court; the question is whether New Zealand is a clearly more convenient forum." R.51:12; Appellant Appx. Tab 1, p. 12. After its thorough and extensive evaluation of the private interest factors, the district court properly exercised its discretion when it held that "it is clear that, on the whole, New Zealand is more convenient." *Id.* at 13.

### 2. The Public Interest Factors Support Dismissal on *Forum Non Conveniens* Grounds.

Courts often consider the following five public interest factors when determining the prudence of a *forum non conveniens* dismissal: (1) the local interests in the

lawsuit; (2) the court's familiarity with the governing law; (3) the burden on local courts and juries; (4) the congestion in the court; and (5) the costs of resolving a dispute unrelated to a particular forum. *Bos. Telecomms. Grp. v. Wood*, 588 F.3d 1201, 1211 (9th Cir. 2009).

Here, the district court held that "the public interest factors weigh even more strongly in favor of dismissal" than the private interest factors. R.51:13; Appellant Appx. Tab 1, p. 13. The court further noted that "all relevant events occurred in New Zealand, all parties were living in New Zealand during the relevant time." *Id.* The court properly considered the burden such a case would have on jurors in Wisconsin and noted that "jury duty is a burden that ought not to be imposed on a community which has no relation to the litigation." *Id.* (quoting *AM. Dredging*, 510 U.S. at 448).

Appellant argues that the district court misapplied the public interest factors because Congress intended to give the TVPA extraterritorial effect. This argument is flawed for several reasons. First, whether the civil remedy provision of the TVPA has extraterritorial effect is not settled law. Second, the lower court specifically reasoned that "***even if*** the TVPA civil remedy provision does apply outside the United States, that would not be dispositive." R.51:15; Appellant Appx. Tab 1, p. 15 (emphasis added). The district court correctly noted that "whether a plaintiff is asking the court to apply domestic or foreign law . . . is just one factor of many." *Id.*

Here, the "local interests in the suit" is another public interest factor that weighs strongly in favor of a New Zealand forum. As the district court reasoned, the "only interest the United States has in this case is that it involves alleged misconduct by a

permanent resident of the United States." *Id.* at 16. The court properly addressed this interest, and weighed the fact that Gaiman was also a permanent resident of New Zealand—which the court noted as a reason "this factor does not weigh heavily in favor of retaining jurisdiction." *Id.* The court emphasized New Zealand's interest in adjudicating this suit because it has a "stronger interest in protecting one of its own citizens from wrongful conduct committed in New Zealand by a New Zealand permanent resident." *Id.* Because the district court reasonably weighed all relevant public interest factors, it did not abuse its discretion when it dismissed Appellant's claims in favor of a New Zealand forum.

## II.     THE TVPA DOES NOT BAR *FORUM NON CONVENIENS* DISMISSAL

Appellant argues that *forum non conveniens* cannot be applied to the TVPA under the flimsy premise that *forum non conveniens* "can have no application at all to a claim that Congress specifically designated as one to be heard in U.S. courts." Appellant's Brief at 23 (citing *United States v. Nat'l City Lines*, 334 U.S. 573 (1948) ("*National City Lines I*")). The Appellant waived this issue by not raising it in the district court.  And if not waived, the Appellant's Argument is without merit.

### A. Appellant Waived the Issue That the TVPA Bars the Application of the *Forum Non Conveniens* Doctrine.

Appellant failed to raise the issue of whether *forum non conveniens* applies to the TVPA in the district court even though she had ample opportunity to do so in her briefing.  Accordingly, she has waived appellate review of that issue. It is a well-established rule in this Circuit that a party waives the right to argue an issue on

appeal if she fails to raise that issue before the district court. *Robyns v. Reliance Standard Life Ins. Co.*, 130 F.3d 1231, 1237 (7th Cir. 1997); *Moulton v. Vigo Cnty.*, 150 F.3d 801, 803 (7th Cir.1998); *Stevens v. Umsted*, 131 F.3d 697, 705 (7th Cir.1997) ("It is axiomatic that arguments not raised below are waived on appeal."); *Hale v. Victor Chu*, 614 F.3d 741, 744 (7th Cir. 2010) (deemed argument waived when the record contained no evidence that the plaintiff ever alerted the district court to the issue raised for the first time on appeal).

Even though the appellant's argument that *forum non conveniens* does not apply to the TVPA has been waived, Gaiman will address appellant's argument in an abundance of caution in case the Court disagrees with Gaiman's position on waiver.

## B. The Appellant's Argument Regarding The Applicability of The *Forum Non Conveniens* Doctrine is Misplaced.

The Appellant's  argument that the *forum non conveniens* doctrine does not apply to the TVPA is based on a misreading of *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947), and the opinion of *National City Lines I*, a seventy-eight-year-old case concerning the Sherman Act that has been limited by statutory changes and by subsequent case law. *See Nat'l City Lines I*, 334 U.S. at 573; *see also Howe v. Goldcorp Invs., Ltd.*, 946 F.2d 944, 945 (1st Cir. 1991) (holding that federal courts have "the power to invoke the *forum non conveniens* doctrine in private action claiming a violation of American anti-fraud securities statutes, as they do in cases brought under most other federal statutes"). This Court must reject Appellant's argument because even those circuits that follow the *National City Lines I* case have only ever been applied that holding to a limited number of specific statutes. Those same circuits have held that statutory

venue provisions do not apply to legislation that is far more analogous to the TVPA.

Appellant asserts that the *Gilbert* Court imposed a limitation on *forum non conveniens* dismissals—namely, that the doctrine could only be used when "plaintiff brings a claim under a general jurisdiction statute (such as 28 U.S.C. §§ 1331 or 1332)." Appellant's Brief at 24. This is a misreading of *Gilbert*. *Gilbert* was not restrictive to *forum non conveniens*, it was expansive. The case actually reads: "The principle of *forum non conveniens* is simply that a court may resist imposition upon its jurisdiction **even when** jurisdiction is authorized by the letter of a general venue statute." *Gilbert*, 330 U.S. at 507 (emphasis added). *Gilbert* is the seminal *forum non conveniens* case that solidified a federal court's powers to dismiss suits properly within their jurisdiction. *Id.* at 504. The *Gilbert* Court did distinguish itself from previous cases on the basis that those earlier cases were based on a statute (FELA) that the Court had previously found to defeat *forum non conveniens* dismissal. *Id.* at 505. But, *Gilbert* limits that distinction to FELA cases and does not support the broad assertion that any special venue statute precludes *forum non conveniens* dismissal.

Appellant relies on *National City Lines I* for the premise that if a statute provides a plaintiff with a choice of forum, courts cannot deprive plaintiffs of that choice. Appellant's Brief at 24. In *National City Lines I*, the Court did in fact find that the Sherman Anti-Trust Act precluded *forum non conveniens* dismissal; however, since 1948, this ruling has been severely curtailed by both statute and case law.

In a more recent case, the First Circuit noted that immediately after the Court decided *National City Lines I*, Congress enacted "28 U.S.C. § 1404(a), that explicitly

permitted domestic transfer of cases to more convenient forums. And, the very next year the Supreme Court simply *overruled National City Lines I.*" *Howe*, 946 F.2d at 949. The *Howe* court further noted that most case law in recent years has taken positions contrary to the argument that *National City Lines I* still governs and cites a list of cases that refused to follow its precedent.[5]

Appellant claims that "multiple other Circuits have reached similar conclusions in connection with other federal laws, finding *forum non conveniens* categorically inapplicable." Appellant's Brief at 25. This is quite an assertion given that all the cases she cites primarily deal with Ninth and Eleventh Circuit cases dealing with the Jones Act and FELA claims. *Id.* Further, she leaves out rulings from other Circuits which completely reject *National City Lines I. See, e.g., Cap. Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 608 (2d Cir. 1998), *cert denied*, 526 U.S. 1067 (1999) (holding that *Nat'l City Lines I*'s holding was limited to domestic transfers and that antitrust suits are subject to *forum non conveniens* dismissal); *Transunion Corp.*, 811 F.2d at 130 (holding that by the time RICO was enacted in 1970, *National City Lines I* had been "effectively overruled by Congress").

There does appear to be a circuit split as to whether federal courts have the power to dismiss on *forum non conveniens* grounds for **certain statutes**. Notably, this Circuit appears not to have ever limited federal court's power to dismiss on *forum*

---

[5] *Transunion Corp. v. Pepsico, Inc.*, 811 F.2d 127, 130 (2d Cir. 1987) (*forum non conveniens* applicable in RICO cases notwithstanding special venue provision); *In re Aircrash Disaster Near New Orleans*, 821 F.2d 1147, 1163-64 (5th Cir. 1987) (*forum non conveniens* applicable under Jones Act notwithstanding special venue provision); *Cruz v. Maritime Co. of Phillipines,* 702 F.2d 47, 48 (2d Cir. 1983) (same).

*non conveniens* grounds beyond the traditional *Gilbert* analysis. No federal court of appeals has ever held that TVPA claims cannot be dismissed on *forum non conveniens* grounds. Of those circuits that have precluded *forum non conveniens* dismissals, those dismissals have been limited to very specific statutes—mostly the Jones Act and FELA. The Ninth and Eleventh Circuits exempt Jones Act cases from *forum non conveniens* dismissal but not claims arising from the Carriage of Goods by Sea Act ("COGSA"), RICO, the Copyright Act, the Lanham Act, nor the Torture Victims Protection Act.[6] The trend has been a shift away from viewing a federal statutory claim as a mandate for taking jurisdiction over the last ***sixty years.***

The Second Circuit is a good example of this shift. "Where it once viewed the assertion of a federal statutory claim as a mandate for taking jurisdiction, the Second Circuit now squarely rejects the notion that courts are without power to dismiss any claim on *forum non conveniens* grounds." Lonny Sheinkopf Hoffman & Keith A. Rowley, *Forum Non Conveniens in Federal Statutory Cases*, 49 Emory L.J. 1137 (2000). Over a period of decades, Second Circuit cases have favored the power of federal courts to dismiss on *forum non conveniens* grounds notwithstanding any federal statutory grant of jurisdiction. *See Alcoa S.S. Co. v. M/V Nodic Regent*, 541 F.2d 307 (2d Cir. 1976) (*en banc*) (holding that admiralty claims were subject to the same *forum non conveniens* analysis as non-admiralty claims); *see also Cap. Currency Exch.*, 155 F.3d at 603 (holding that antitrust claims are subject to *forum non conveniens* dismissal according to the standard *Gilbert* analysis).

---

[6] Lonny Sheinkopf Hoffman & Keith A. Rowley, *Forum Non Conveniens in Federal Statutory Cases*, 49 Emory L.J. 1137 (2000).

While Gaiman argues that the Seventh Circuit should follow the approaches of the First and Second Circuits, even if this Court chooses to adopt the approach of the Fifth, Ninth, and Eleventh Circuits, the TVPA would still not be considered the type of legislation prohibiting *forum non conveniens* dismissals. While there is a dearth of case law that directly discusses this issue as it relates to the TVPA, many decisions allow this analysis under far more contemporary legislation much more similar to the TVPA in both language and purpose.

The Torture Victim Protection Act[7] was first enacted in 1991 and closely parallels the TVPA both temporally and in its legislative purpose. The Torture Victim Protection Act expressly creates a federal civil cause of action for torture and extrajudicial killing committed abroad, reflecting Congress's intent to guarantee victims of human-rights abuses meaningful access to a federal forum. *See* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 2(a), 106 Stat. 73. The Torture Victim Protection Act's remedial purpose mirrors the TVPA's far more than the century-old maritime and employment statutes addressed in the cases Appellant cites. Appellant's Brief at 23-26. Because the Torture Victim Protection Act was enacted only a decade before Congress added the TVPA's civil remedy in 2003, it offers a far more accurate indicator of Congress's modern legislative intent.

The Second and Ninth Circuits have spoken directly to the *forum non conveniens* issue as it relates to the Torture Victim Protection Act. *Wiwa v. Royal Dutch Petrol.*

---

[7] Because the common abbreviation for this legislation is also TVPA, the full name of this legislation will be used to refer to the Torture Victim Protection Act and TVPA will be used exclusively for the Trafficking Victims Protection Act.

*Co.*, 226 F.3d 88, 106 (2d Cir. 2000); *Mujica v. Occidental Petrol. Corp.*, 381 F. Supp. 2d 1134, 1142 (C.D. Cal. 2005). The Eleventh Circuit has addressed the question indirectly by affirming a *forum non conveniens* dismissal of Torture Victim Protection Act claims without expressing any concern regarding the doctrine's applicability. *Aldana v. Del Monte Fresh Produce N.A.*, 578 F.3d 1283, 1287 (11th Cir. 2009).

In *Wiwa*, the court held that the Torture Victim Protection Act did not "nullify, or even significantly diminish, the doctrine of *forum non conveniens*." *Wiwa*, 226 F.3d at 106. Courts within the Ninth Circuit reached the same conclusion. In *Mujica*, the district court held that "while the Court agrees that Congress enacted the [Torture Victim Protection Act] for the purpose of providing a civil cause of action for torture committed abroad, there are no statements that courts must entertain all [Torture Victim Protection Act] claims regardless of *forum non conveniens* considerations." *Mujica*, 381 F. Supp. 2d at 1142.

Similarly, the Eleventh Circuit implicitly recognized *forum non conveniens* applicability to Torture Victim Protection Act claims. In *Aldana*, the district court dismissed Torture Victim Protection Act claims on *forum non conveniens* grounds, and the plaintiffs appealed. *Aldana*, 578 F.3d at 1287. The Court of Appeals affirmed, holding that the district court did not abuse its discretion in dismissing the action under *forum non conveniens* principles. *Id*. at 1300. The Eleventh Circuit did not even question whether *forum non conveniens* applies to Torture Victim Protection Act claims, reinforcing the overwhelming judicial consensus that the doctrine applies. *Id*.

Appellant's reliance on pre-1990s FELA and Jones Act cases is misplaced and unconvincing. The statute most analogous to the TVPA is the Torture Victims Prevention Act of 1991, whose legislative purpose and timing better reflect Congress's contemporary human-rights framework. Courts interpreting the Torture Victim Protection Act—including those circuits that proscribe *forum non conveniens* dismissal of certain statutes—have uniformly held that the statute does not bar *forum non conveniens* dismissal. *Aldana*, 578 F.3d at 1287; *Mujica*, 381 F. Supp. 2d at 1142; *Wiwa*, 226 F.3d at 106. The same approach should guide the analysis of *forum non conveniens* dismissal under the TVPA.

## III.  THE CIVIL REMEDY PROVISION OF THE TVPA DOES NOT APPLY EXTRATERRITORIALLY

Appellant argues that the civil remedies provision of the TVPA, 18 U.S.C. § 1595, should be given extraterritorial effect and Gaiman argued below that § 1595 does not have extraterritorial reach. The district court discussed but did not decide the issue. The district court discussed extraterritoriality in the context of weighing the public interest factors and concluded that Gaiman had the better extraterritoriality argument. Despite the court's acknowledgement that § 1595 likely cannot be extended extraterritorially, the court's dicta on this issue did not affect its *forum non conveniens* decision: "But even if the TVPA civil remedy provision does apply outside the United States, that would not be dispositive." R. 51:15; Appellant Appx. Tab 1, p. 15. Because the district court considered Appellant's extraterritoriality argument and determined that it was not dispositive of the *forum non conveniens* issue, it was

within the district court's discretion to decline to fully decide the extraterritoriality issue.

The Appellant's argument that "the TVPA clearly and unambiguously provides a civil remedy for extraterritorial conduct" is overstated and ignores the fact that courts are divided on this issue. As the district court suggested, § 1595 likely does not overcome the presumption against extraterritoriality because: (1) the provision does not contain a clear, affirmative indication that it applies extraterritorially; (2) the case does not involve a domestic application of the statute; and (3) extraterritorial reach should not be given to a private right of action unless the statute specifically addresses foreign injuries.

## A. The Presumption Against Extraterritoriality Must be Applied to § 1595 of The TVPA.

The presumption against extraterritoriality must be applied to § 1595 of the TVPA. *See RJR Nabisco*, 579 U.S. at 336 (Courts "apply the presumption across the board, regardless of whether there is a risk of conflict between the American statute and a foreign law.") (internal quotations omitted). The purposes of the presumption against extraterritoriality include "avoiding international discord that can result when U.S. law is applied to conduct in foreign countries" and the "commonsense notion that Congress generally legislates with domestic concerns in mind." *Id.* at 335.

The Supreme Court established a two-step framework for analyzing extraterritorial issues. *Id.* At the first step, the question is "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* at 337. If the

presumption has not been rebutted, then court must determine "whether the case involves a domestic application of the statute." *Id*. This is done by "looking at the statute's focus" and determining whether "the conduct relevant to the statute's focus occurred in the United States." *Id*. If so, "then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application." *Id*.

## B. Congress Did Not Give a Clear, Affirmative Indication That § 1595 Applies Extraterritorially.

Appellant portrays the issue of whether the civil remedies provision of the TVPA applies extraterritorially as unambiguous. Ambiguity is evident in the mixed findings of courts addressing the issue, including the dicta of the district court's opinion. The only appellate court decision on the issue to date, *Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019), held that the civil remedies provision does apply extraterritorially. Gaiman argued, and the district court appears to have agreed, that this decision was incorrect. First, the statute lacks the clear indication required to overcome the presumption against extraterritoriality. Second, the decision is in direct conflict with the Supreme Court's decision in *RJR Nabisco*, where it was held that the civil remedy provision of RICO did not provide extraterritorial jurisdiction for ***injuries*** that are not experienced domestically. *See Adhikari v. KBR Inc.*, No. 16-CV-2478, 2017 WL 4237923, at *5 (S.D. Tex. Sept. 25, 2017) ("*RJR Nabisco*'s general rule is clear: a civil remedy that lacks clear indications of extraterritorial reach will redress only injuries

experienced domestically, no matter the substantive provisions' scope. Section 1595 lacks those clear indications.").

The TVPA was first enacted in 2000. Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 (2000). In 2003, the first amendment to the TVPA added § 1595 which provided a civil remedy for any victim of an offense under Chapter 77. Section 1595 was amended several other times, lastly in 2023. In 2008, § 1596 was added which permits extra-territorial jurisdiction for specific *offenses* within the TVPA. The civil remedies section was not included in § 1596's list of specific offenses. The current iteration of the civil remedy statute contains no mention of extraterritoriality:

> (a) An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees.

18 U.S.C. § 1595. The TVPA's extraterritoriality statute specifically lists the statutes to which it should be applied, notably omitting the civil remedy provision:

> **(a) In General.**—In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any *offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591* if—
> **(1)** an alleged offender is a national of the United States or an alien lawfully admitted for permanent residence (as those terms are defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)); or
> **(2)** an alleged offender is present in the United States, irrespective of the nationality of the alleged offender.

*Id.* § 1596 (emphasis added).

Few courts have addressed the question of whether the TVPA's extraterritorial jurisdiction statute, § 1596, extends to civil remedies under § 1595. Two conflicting holdings from the D.C. District illustrate the divided opinion on § 1595's extraterritoriality. *See Doe I v. Apple Inc.*, No. 19-CV-03737 (CJN), 2021 WL 5774224, at *14 (D.D.C. Nov. 2, 2021), *aff'd sub nom. Doe 1 v. Apple Inc.,* 96 F.4th 403 (D.C. Cir. 2024) (holding that Congress did not authorize extra-territorial jurisdiction for civil remedies under § 1595); *but see United States ex rel. Hawkins v. ManTech Int'l Corp.*, 752 F. Supp. 3d 118, 135 (D.D.C. 2024) (holding that § 1595 can apply extra-territorially).

The *Doe I* court held that § 1595 does not overcome the presumption against extraterritoriality. The court first analyzed the language of §§ 1595 and 1596. "On its face, [§ 1595] says nothing about extraterritorial application. Thus, standing alone, it does nothing to rebut the presumption that it applies only domestically." *Id.* The *Doe I* court further reasoned that the extraterritorial language contained in § 1596 only contained language that applied to criminal statutes, not the civil remedy. *Id.* at *15.

Section 1596 expressly grants extraterritorial jurisdiction to many criminal statutes, but not the civil remedy statute. The *Doe I* court noted that "in the very same Act, Congress amended the text of § 1595 itself." *Id.* Congress could have easily included the civil remedies provision in this list but chose not to. *Id.* at *15 ("Congress could have easily included § 1595 in § 1596, but it did not."). Further, the *Doe I* court

reasoned that "the text and structure of § 1596 suggest that it was focused on criminal, not civil, applications." *Id*. For example, the "title of § 1596 is 'Additional jurisdiction in certain trafficking **offenses**.'" *Id*. (quoting 18 U.S.C. § 1596) (emphasis added). The Court observed that the word "offense" is only used to refer to crimes in Title 18, not civil actions. *Id*. The Supreme Court has also concluded that that in Title 18, the term "offense" refers to criminal violations: "Although the term appears hundreds of times in Title 18, neither respondent nor the Solicitor General, appearing as an *amicus* in support of respondent, has been able to find a single provision of that title in which 'offense' is employed to denote a civil violation." *Kellog Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 659 (2015). The *Doe I* court concluded that Congress's omission of § 1595 in the enumerated list of statutes affected by § 1596 "was an intentional decision not to extend extraterritoriality the reach of the statute's civil component." 2021 WL 5774224 at *16.

The *Hawkins* court offers an example of a holding that § 1595 has extraterritorial reach. 2024 WL 4332117 at *13. The reasoning in *Hawkins*, however, fails to establish Congresses clear intention to overcome the presumption against extraterritorial jurisdiction. The *Hawkins* court reasoned that (1) other provisions of the TVPA had an extra-territorial reach prior to the 2008 amendment; (2) that § 1595 is not an "offense," but rather a free-standing provision that creates a remedy for an offense; and (3) the predicate offenses have an extraterritorial reach. *Id*. at *11. All of these reasons fail to overcome the presumption against extraterritoriality.

The *Hawkins* court asserted that because some specific provisions within the TVPA granted extraterritorial jurisdiction before the 2008 amendment that added § 1596, "it would be inappropriate to predicate a narrowing construction of the civil provision on a later, unrelated amendment to the statute. *Id*. This assertion is flawed because § 1596 ***expands*** the extraterritorial reach of the TVPA, rather than narrow it. Section 1596 did not rescind extraterritoriality for previously existing statutes. It extended extraterritoriality, limited to the statutes enumerated within § 1596.

The *Hawkins* court's second rationale—the fact that § 1595 "is a free-standing provision that creates a civil remedy," *id*., means that its omission in § 1596 does not preclude extra-territorial jurisdiction—is directly contradicted by well-established Supreme Court precedent. The first step for analyzing extraterritoriality issues is "whether the presumption against extraterritoriality has been rebutted—that is whether the statute gives a clear, affirmative indication that it applies extraterritorially. We must ask this question regardless of whether the statute in question regulates conduct, ***affords relief***, or merely confers jurisdiction." *RJR Nabisco*, 579 U.S. at 337 (emphasis added). Because statutes that afford relief, as § 1595 does, must be evaluated independently, it is entirely relevant that it is omitted from the statute granting extraterritorial jurisdiction.

## C. The Supreme Court's Decision in *RJR Nabisco* Controls.

The *Hawkins* court relied heavily on the only appellate case to date that has rendered a decision on whether § 1596 applies to § 1595—*Roe v. Howard*, 917 F.3d 229, 244 (4th Cir. 2019). The *Roe* court held that § 1595 has extraterritorial reach

38

through § 1596; however, its holding was entirely based on a misapplication of the Supreme Court's precedent in *RJR Nabisco*. First, the *Roe* case was not about conduct within a foreign jurisdiction. It was about conduct by a U.S. State Department employee on the grounds of the U.S. embassy in Sana'a Yemen. The court established that the Special Maritime and Territorial Jurisdiction statute encompasses the grounds of U.S. diplomatic installations—a notable contrast with the present case which alleges conduct solely within the jurisdiction of a foreign nation.

The error the *Roe* court makes, and the reason this Court should not rely on it, is because it misinterpreted the Supreme Court's decision in *RJR Nabisco*. In *RJR Nabisco*, the Court decided two issues: (1) whether substantive provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO") contained in § 1962 apply to conduct that occurs in foreign countries; and (2) whether RICO's private right of action contained in § 1964(c) applies to injuries that are suffered in foreign countries. *RJR Nabisco*, 579 U.S. at 325. The *Roe* court erred in applying the substantive RICO analysis to the TVPA's civil remedy statute—it should have applied the analysis the *RJR Nabisco* Court used to analyze RICO's **civil remedy**. Because it did not, it was wrongly decided.

In *RJR Nabisco*, the Court held that the substantive definitions of racketeering activity within § 1962 were sufficiently predicated on statutes that expressly apply extraterritorially. *Id.* at 345. Despite this finding, the Court held that § 1964(c), which provides a civil remedy for "violations of section 1962," does not allow recovery for foreign injuries." *Id.* at 353. The different treatment of the civil remedies provision is

partly based on the Court's acknowledgment that "providing a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct." *Id.* at 346-47. The Court determined that "there is a potential for international controversy that militates against recognizing ***foreign-injury claims*** without clear direction from Congress." *Id.* at 348 (emphasis added).

After differentiating between the substantive RICO statute and the civil remedies provision, the Court goes on to find that "nothing in § 1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside the United States." *Id.* at 350. Even though § 1964(c) states that any "person injured in his business or property by reason of a violation of section 1962 of this chapter may sue . . . in any appropriate United States district court," it did not provide a clear indication that Congress intended to create a private right of action for ***injuries*** suffered outside the United States. The Court reached this conclusion despite the fact that it held § 1962 had extraterritorial reach in the very same opinion. *Id.* at 345. The Court reasoned that the concept of a foreign injury is distinct from the concept of violating a criminal statute. The same distinction must be made in the present case. As *RJR Nabisco* Court said: "It is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries." *Id.* at 350.

The civil remedies statute in the present case reads nearly the same as the civil remedy statute confronted by the *RJR Nabisco* Court. TVPA § 1595 states:

> **(a)** An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees.

18 U.S.C. § 1595. RICO's § 1964(c) states:

> **(c)** Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

*Id.* § 1964. Importantly, both statutes address violations of substantive laws. The TVPA's civil remedy statute addresses all violations within the chapter, some of which either grant extraterritorial jurisdiction through provisions within the statute or by reference from § 1596. RICO's civil remedies statute addresses § 1962, which itself references statutes granting extraterritorial jurisdiction.

*RJR Nabisco* differentiated between the criminal statute applying extraterritorially and the civil remedy applying extraterritorially because the civil remedy invokes an injury rather than just the violation of the underlying crime. *RJR Nabisco*, 579 U.S. at 328. This same reasoning must be applied here, as the Appellant's claims are not just based on foreign conduct but based on foreign injuries as well.

Appellant argues that "RICO's structure and the TVPA's structure are very different." In support of this argument, she states (1) that RICO's civil remedies

statute excludes certain types of remedies—such as personal injury; (2) the language of § 1595 that it applies to "a victim of a violation of this chapter"; and (3) that RICO's civil action provision uses the term "injury." Appellant's Brief at 20-21. These arguments fail adequately distinguish *RJR Nabisco*.

Appellant's argument that RICO's civil remedies provision is different because it has narrowing language, such as the fact that certain types of remedies are excluded, is unconvincing. The *RJR Nabisco* Court addressed the "cabining of RICO's private cause of action to particular kinds of injury," but this analysis was limited to whether the civil provision being narrower than the substantive provision supports a finding of extraterritoriality. *RJR Nabisco*, 579 U.S at 349-50. The Court held that it does not. *Id*. The Court was merely attempting to find something within RICO's § 1964(c) provision that "provides a clear indication Congress intended to create a private right of action for injuries suffered outside the United States." *Id.* at 249-50. It turned to the language of the statute and held that it could find none.

The Court in *Mia v. Kimberly-Clark Corp.*, addressed this same argument and reached the same conclusion—it was logically flawed. "*RJR Nabisco* did not cite that [RICO is limited to certain types of injuries] as an *affirmative* reason that RICO's private right of action does not apply extraterritorially, it just noted that it 'does not *indicate* extraterritoriality'—and that nothing else in the text of the civil remedy provision does either." No. 22-cv-2353, 2025 WL 752564, at *7 (D.D.C. Mar. 10, 2025). As such, the *Mia* court correctly rejected the *Roe* court's reasoning distinguishing the TVPA from the *RJR Nabisco* decision.

42

Appellant's argument that the language of the "TVPA expressly makes its civil and criminal provisions fully coextensive" is also flawed and contrary to the holding of *RJR Nabisco*. The language of § 1595 states: "An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator[.]" This is very similar to the RICO provision which provides a cause of action to "[a]ny person injured his business or property" by a violation of § 1962. *RJR Nabisco*, 579 U.S. at 349. The *RJR Nabisco* Court held that "the word 'any' ordinarily connotes breadth, but it is insufficient to displace the presumption against extraterritoriality. Likewise, the verbiage from § 1595 fails to provide the "clear indication of extraterritorial application" required to displace the presumption against extraterritoriality. *Id.* at 335.

Finally, Appellant argues that *RJR Nabisco* does not apply to this case because RICO's civil remedies provision required a plaintiff to have been "injured in his business or property," while the TVPA refers more broadly to "an individual who is a victim of a violation of this chapter." 18 U.S.C. § 1964(c); 18 U.S.C. § 1595. This does not affect the broader *RJR Nabisco* ruling because ***both statutes require an injury***. The TVPA's civil remedies provision refers to damages, which is a remedy that requires an injury. *See* DAMAGES, Black's Law Dictionary (12th ed. 2024) ("**damages** *n. pl.* (16c) Money claimed by, or ordered to be paid to, a person as compensation for loss or injury"). Because § 1595 requires an injury, this Court must reject Appellant's argument and follow the *RJR Nabisco* precedent.

While there are certainly some minor differences between RICO's civil remedies provision and the TVPA, the similarities are plentiful. RICO and the TVPA both include criminal provisions that apply extraterritorially. Both include civil enforcement provisions that incorporate the criminal prohibitions but lack language that clearly extends the civil provisions extraterritorially. Both require an injury. As such, this Court should use the same criteria to evaluate the TVPA as the *RJR Nabisco* Court used to evaluate RICO and find that § 1595 does not overcome the presumption against extraterritoriality.

## CONCLUSION

For the aforementioned reasons, this Court should find that the district court did not abuse its discretion and affirm its order of dismissal.

Dated: December 22, 2025.

Respectfully submitted,

KRAVIT, HOVEL & KRAWCZYK S.C.

*s/Stephen E. Kravit*
Stephen E. Kravit
State Bar No. 1016306
Brian T. Fahl
State Bar No. 1043244
Wesley E. Haslam
State Bar No. 1121993
Kravit, Hovel & Krawczyk s.c.
825 North Jefferson Street, Suite 500
Milwaukee, Wisconsin 53202
(414) 271-7100 (phone)
(414) 271-8135 (facsimile)
kravit@kravitlaw.com
btf@kravitlaw.com
weh@kravitlaw.com

-and-

BERK BRETTLER LLP

*s/Andrew B. Brettler*
Andrew B. Brettler
Pro hac vice
Berk Brettler LLP
9119 West Sunset Boulevard
West Hollywood, California 90069
(310) 278-2111
abrettler@berkbrettler.com

*Attorneys for Defendant-Appellee*

## CERTIFICATE OF COMPLAINCE WITH FRAP RULE 32(A)(7), FRAP RULE 32(G) AND CR 32(C)

The undersigned counsel of record for Defendant-Appellee, Neil Gaiman, furnishes the following in compliance with F.R.A.P Rule 32(a)(7):

I hereby certify that this brief conforms to the rules contained in Fed. R. App. P. 32(a)(7), Fed. R. App. P. 32(g) and Circuit Rule 32(c) for a brief produced with a proportionally spaced typeface using Microsoft Word 2010 in Century Schoolbook 12-point font. The length of this brief is 11,812 words.

Dated this 22nd day of December, 2025.

KRAVIT, HOVEL & KRAWCZYK S.C.

*s/Stephen E. Kravit*
Stephen E. Kravit
State Bar No. 1016306
Brian T. Fahl
State Bar No. 1043244
Wesley E. Haslam
State Bar No. 1121993
825 North Jefferson Street, Suite 500
Milwaukee, Wisconsin 53202
(414) 271-7100 (phone)
(414) 271-8135 (facsimile)
kravit@kravitlaw.com
btf@kravitlaw.com
weh@kravitlaw.com

-and-

BERK BRETTLER LLP

*s/Andrew B. Brettler*
Andrew B. Brettler
Pro hac vice
Jake A. Camara
Pro hac vice

46

9119 West Sunset Boulevard
West Hollywood, California 90069
(310) 278-2111
abrettler@berkbrettler.com
jcamara@berkbrettler.com

*Attorneys for Defendant-Appellee*